UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

In re:

**K&D INDUSTRIAL SERVICES**        Case No.  19-43823
**HOLDING CO., INC., et al,**[1]         Chapter 11
                                                      Hon.  Phillip J. Shefferly
          **Debtor.**

---

## COVER SHEET FOR MOTION TO APPROVE SALE PROCEDURES

The Debtors have filed a motion for approval of procedures for the sale of assets, which is attached to this cover sheet. Pursuant to E.D. Mich. L.B.R. 6004-1, the Debtors have identified below, by page and paragraph number, the location in the proposed order accompanying the motion of each of the following provisions:

| PROVISION | Contained in proposed order | Location in proposed order |
|---|---|---|
| (1) Provisions concerning the qualifications of the bidding parties. | __X__ Yes<br><br>_____ No | Page 3, ¶ b |

---

[1] The Debtors in these jointly administered proceedings are K&D Industrial Services Holding Co., Inc. (Case No. 19-43823), K&D Industrial Services, Inc. (Case No. 19-43824), K&D Industries, Inc. (Case No. 19-43825), K&D Grand Rapids, Inc. (Case No. 19-43826), K&D Industries of Ohio, Inc. (Case No. 19-43827), K&D Industrial Services Midwest, Inc. (Case No. 19-43828), K&D Industries West, Inc. (Case No. 19-43829), and L&P Industries LLC (Case No. 19-43830).

1

| | | |
|---|---|---|
| (2) Provisions concerning the criteria for a qualifying bid and any deadlines for (i) submitting such a bid, and (ii) notification of whether the bid made constitutes a qualifying bid. | _X_ Yes<br><br>____ No | Page 3-4, ¶ b.3-4 |
| (3) Provisions that require qualified bids to identify points of variation from the stalking horse bid (including price and other terms). | _X_ Yes<br><br>____ No | Page 5, ¶e(ii) |
| (4) Provisions pertaining to the conditions to the qualified bidders' obligation to consummate the purchase (including the time period within which the purchaser must close the transaction). | _X_ Yes<br><br>____ No | Page 7, ¶ g |
| (5) Provisions pertaining to the amount required for a good faith deposit. | _X_ Yes<br><br>____ No | Page 4, ¶ b.4 |
| (6) Provisions that relate to a "Back-Up Buyer" should the first winning bidder fail to close the transaction within a specified period of time. | _X_ Yes<br><br>____ No | Page 7, ¶ g(ii) |
| (7) No-shop or No-Solicitation provisions including the justification for such provision. | ____ Yes<br><br>_X_ No | Page ___, ¶ ___ |
| (8) Provisions relating to Break-Up fees, Topping fees, and/or Expense Reimbursement (including the waiver of such fees due to rebidding). | _X_ Yes<br><br>____ No | Page 5, ¶ e(iii) |
| (9) Provisions specifying the bidding increments. | _X_ Yes<br><br>____ No | Page 5, ¶ e(iii) |

2

| | | |
|---|---|---|
| (10) Provisions relating to auction procedures including manner in which auction is to be conducted and when the auction will be open and when it will close. | _X_ Yes<br><br>____ No | Page 6, ¶ f |
| (11) Provisions relating to whether the auction will occur and the termination of the auction process and/or sale. | _X_ Yes<br><br>____ No | Page 6, ¶ f(ii) |
| (12) Provision whether 14 day stay of F.R.Bankr.P. 6004(h) and 6006(d) is waived. | _X_ Yes<br><br>____ No | Page 13, ¶ ____ |
| (13) Provisions regarding timing for notice, submission of bids, objections to sale and other key events. | _X_ Yes<br><br>____ No | Page 13, ¶ ____ |

Date: _____4/2/19_____        /s/ Lynn M. Brimer _____
                                LYNN M. BRIMER (P43291)
                                PAMELA S. RITTER (P47886)
                                JAMES M. McARDLE (P82443)
                                Strobl Sharp PLLC
                                300 E. Long Lake Road, Suite 200
                                Bloomfield Hills, MI 48304-2376
                                (248) 540-2300; fax (248) 645-2690
                                Attorneys for Debtor and Debtor in
                                Possession
                                lbrimer@stroblpc.com
                                pritter@stroblpc.com
                                jmcardle@stroblpc.com

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

In re:

K&D INDUSTRIAL SERVICES       Case No.  19-43823
HOLDING CO., INC., et al,[1]       Chapter 11
                                Hon.  Phillip J. Shefferly

      Debtor.

---

## DEBTORS' MOTION FOR ENTRY OF ORDER (A) ESTABLISHING BIDDING PROCEDURES FOR THE AUCTION SALE OF CERTAIN OF DEBTORS' ASSETS FREE AND CLEAR OF LIENS, CLAIMS AND ENCUMBRANCES AND TRANSFERRING LIENS TO PROCEEDS; (B) SCHEDULING AN AUCTION AND A SALE HEARING TO CONSIDER APPROVAL OF SALE; (C) ESTABLISHING PROCEDURES FOR THE ASSUMPTION AND ASSIGNMENT OF EXECUTORY CONTRACTS; (D) APPROVING THE FORM OF ASSET PURCHASE AGREEMENT, FORM AND MANNER OF THE AUCTION NOTICE, THE FORM OF THE NOTICE TO NON-DEBTOR CO-PARTIES TO EXECUTORY <u>CONTRACTS, AND THE NOTICE OF THE SALE HEARING</u>

The above captioned Debtors and Debtors-in-Possession (collectively, the "Debtors"), bring this Motion for Entry of an Order, substantially in the form attached hereto as **Exhibit A**, pursuant to 11 U.S.C. §363 and §365 and Federal Rules of Bankruptcy Procedure 2002, 9006, 6004 and L.B.R. 6004-1 and 9014-1

---

[1] The Debtors in these jointly administered proceedings are K&D Industrial Services Holding Co., Inc. (Case No. 19-43823), K&D Industrial Services, Inc. (Case No. 19-43824), K&D Industries, Inc. (Case No. 19-43825), K&D Grand Rapids, Inc. (Case No. 19-43826), K&D Industries of Ohio, Inc. (Case No. 19-43827), K&D Industrial Services Midwest, Inc. (Case No. 19-43828), K&D Industries West, Inc. (Case No. 19-43829), and L&P Industries LLC (Case No. 19-43830).

1

(A) Establishing Bidding Procedures for the Auction Sale of certain of Debtors' Assets Free and Clear of Liens, Claims and Encumbrances and Transferring Liens to Proceeds; (B) Scheduling an Auction and a Sale Hearing to Consider Approval of the Sale; (C) Establishing Procedures for the Assumption and Assignment of Executory Contracts; (D) Approving the Form of Asset Purchase Agreement, Form and Manner of the Auction Notice, the Form of the Notice to Non-Debtor Co-Parties to the Executory Contracts, and the Notice of Sale Hearing (the "Motion"), and state:

## JURISDICTION AND VENUE

1.      This Court has jurisdiction to consider this Motion pursuant to 28 U.S.C. §1334. Consideration of this Motion is a core proceeding pursuant to 28 U.S.C. §157(b). Venue of this proceeding is proper before this Court pursuant to 28 U.S.C. §1408 and §1409.

## GENERAL BACKGROUND

2.      On March 15, 2019, (the "Petition Date"), K & D Industrial Services Holding Co., Inc. and its subsidiaries; (a) K & D Industrial Services, Inc.; (b) K & D Industries, Inc.; (c) K & D Grand Rapids, Inc.; (d) K & D Industries of Ohio, Inc.; (e) K & D Industrial Services Midwest, Inc.; (f) K & D Industries West, Inc.; and (g) L & P Industries LLC (collectively the "K&D Group of Companies" or the "Debtors") filed voluntary cases under Chapter 11 of the Bankruptcy Code. The

2

Debtors have continued to operate their businesses and manage their properties as Debtors-in-Possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

3.      Due to the close and intertwined relationship amongst the Debtors, an Order for Joint Administration of the Chapter 11 cases was granted [Docket #48]. The background of the Debtors and the events leading to the Bankruptcy filing is fully detailed in the Motion for Use of Cash Collateral and Affidavit in Support [Docket #10].

4.      The principal assets of the Debtors' estates include business equipment, personal property, permits, warranties, purchased intellectual property, ongoing operations and contracts, work in progress, and unpaid accounts receivables.

5.      Prior to the Petition Date and thereafter, the Debtors are in the business of environmental waste hauling and industrial cleaning.

## SALE PROCESS

6.      The Debtors have received an Asset Purchase Agreement from Cleaning Contractors, Inc., a Michigan corporation ("CCI" or "Stalking Horse"), for the purchase of certain of the Debtors' ongoing operations and business assets (the "CCI Purchase Agreement" or "Asset Purchase Agreement"), attached hereto as **Exhibit B**.

7. CCI proposes to purchase the following assets from the Debtors:

(a) all vehicles and equipment listed on Exhibit A of the CCI Purchase Agreement, including all spare parts, hoses, pumps, tools and accessories related thereto (the "Equipment");

(b) all warranties or guaranties, if any, applicable to the Purchased Assets, to the extent such warranties or guaranties are assignable in connection with the Purchased Assets (the "Warranties"); and

(c) the contracts listed on Exhibit B of the CCI Purchase Agreement, (the "Contracts") provided, however, that any Receivables earned from and/or any work in process associated with any of the assigned Contracts prior to the Closing date shall belong to the Debtors. CCI shall have the right to exclude any Contract from Exhibit B of the CCI Purchase Agreement by giving notice to the Debtors and the counterparty to such contract three (3) business days prior to the Closing.

(collectively, the "Purchased Assets").

8. The Purchase Price for the Purchased Assets in the CCI Purchase Agreement is Five Hundred Thousand and 00/100 Dollars ($500, 000.00) (the "Purchase Price"); subject to any closing adjustments and pro-rations on the closing date, if applicable.

9. The Debtors intend for the CCI Purchase Agreement to serve as the Stalking Horse Bid throughout the proposed sale process.

10. The Debtors believe and assert that the proposed procedures for the asset sale, free of all liens, claims and interests, should be approved because a going-concern sale will maximize the value and recovery for the Debtors estates and their creditors. The Debtors will at the Sale Hearing, request that this Court

4

enter an Order, which will include the following findings and provisions (the "Sale Order") authorizing, approving and ordering: (i) a sale to CCI or the Successful Bidder, if applicable, pursuant to either the CCI Purchase Agreement, or to the highest and best Successful Bid pursuant to the Successful Bidder Purchase Agreement; (ii) the sale of the Purchased Assets free and clear of all liens, claims, encumbrances and interests pursuant to the CCI Purchase Agreement, or pursuant to the Successful Bidder Purchase Agreement; (iii) the Successful Bidder, including if such is CCI, as a good faith purchaser entitled to the protections of §363(m) of the Bankruptcy Code; (iv) the sale price of the Purchased Assets is not controlled by a collusive agreement among potential bidders within the meaning of §363(n) of the Bankruptcy Code; (v) that CCI is not the successor of the Debtors, shall have no liability for any pre-closing liabilities, including customer deposits, pre-paid contracts, taxes or union obligations; and (vi) that CCI is not the alter ego or continuation of any of the Debtors.

11.     Debtors request entry of an order providing for the Bidding Procedures set forth herein:

(a)     **Participation Requirements.** Unless otherwise ordered by the Court, each person (a "Potential Bidder") interested in participating in the sale process must deliver by the second (2nd) Business Day before the Bid Deadline to counsel for the Debtors, Lynn M. Brimer, Strobl Sharp PLLC, 300 E. Long Lake Rd., Ste. 200, Bloomfield Hills, MI 48304, such financial statements, financing commitments, or other documents as the Potential Bidder believes provide adequate assurance to the Debtors and their advisors of such Potential Bidder's

5

ability to close on a purchase of the Purchased Assets (the "Transaction"). As used herein, the term "Business Day" shall mean a day on which the Court is open.

(b) **Definition of Qualified Bidder.** Unless otherwise ordered by the Bankruptcy Court for cause shown, a Potential Bidder, shall become a "Qualified Bidder" if the Potential Bidder delivers to counsel for the Debtors on or prior to the Bid Deadline, as described below, the following:

    (i)    Financial disclosures and other information acceptable to the Debtors, to demonstrate such Potential Bidder's financial and other abilities to consummate a sale with respect to any accepted bid;

    (ii)    A fully executed asset purchase agreement (which must be in the form of the CCI Purchase Agreement) which provides, among other things, that any Qualified Bid (as defined below, and any bid made subsequently thereto) made by such Potential Bidder with respect to the Purchased Assets shall be irrevocable until a sale of the Purchased Assets is fully consummated by the Debtors regardless of whether the sale occurs to the Potential Bidder or another party (but in no event later than thirty (30) days after the Auction Date without the consent of both parties);

    (iii)    A Qualified Bid (as defined below), in writing and signed by the Potential Bidder and any other persons against whom the Potential Bidder intends that the bid can be enforced, including but not limited to guarantors (an "Initial Qualified Bid"), must be delivered to counsel for the Debtors addressed to the person stated in the Notice at the address stated in the Notice, not later than the date and time of the Bid Deadline, and such other persons as appear on the Notice; and

    (iv)    A certified check or wired funds in an amount equal to Fifty-Five Thousand and 00/100 Dollars ($55,000.00). The Deposit shall be subject to the jurisdiction of the Bankruptcy Court. (Any of the above possible deposits referred to herein as a "Good Faith Deposit").

6

CCI is automatically considered a Qualified Bidder without further action or consideration.

(c)     **Due Diligence.**   The Debtors are not responsible for, and will bear no liability with respect to, any information obtained by any Qualified Bidder in connection with the sale of the Purchased Assets unless such Qualified Bidder becomes the Successful Bidder and such liability and responsibility is provided for in the agreement evidencing the Transaction between the Debtors and the Successful Bidder and such agreement is approved by the Court.

(d)     **Bid Deadline.**   A Qualified Bidder who desires to make a bid shall advise and deliver a bid to counsel for the Debtors, Lynn M. Brimer, Strobl Sharp PLLC, 300 E. Long Lake Rd., Ste. 200, Bloomfield Hills, MI 48304, no later than 5:00 p.m. (prevailing Eastern Time) on April 26, 2019 (the "Bid Deadline").

(e)     **Definition of Qualified Bid.**   Unless otherwise ordered by the Bankruptcy Court for cause shown, a bid shall become a "Qualified Bid" only if the following occurs:

(i)     The bid must be made by a Qualified Bidder.

(ii)     The bid must be substantially in the form of the CCI Purchase Agreement attached as **Exhibit B** hereto, or as amended from time to time. The Debtors believe that the terms and conditions of the CCI Purchase Agreement are in the best interest of the estate. If a bid deviates from the CCI Purchase Agreement in any manner, the Qualified Bidder must also provide, at the time of submission of the bid, a black-lined copy of the CCI Purchase Agreement to indicate the relevant changes.

(iii)     The minimum aggregate consideration to be received by the Debtors in the bid shall equal or exceed the Purchase Price in the CCI Purchase Agreement plus the Break-Up Fee of Thirty Thousand and 00/100 Dollars ($30,000.00) plus Twenty-Five Thousand and 00/100 Dollars ($25,000.00). All subsequent bids must be in increments of at least Thirty-Five Thousand and 00/100 Dollars ($35,000.00).

7

(iv)     The bid must include written evidence of a commitment for financing or other evidence of the ability to consummate the Transaction satisfactory to the Debtors with appropriate contact information for such financing sources.

(v)      The bid shall contain no material additional contingencies or material requirements binding the Debtors, including but not limited to financing contingencies or contingencies relating to the outcome of due diligence.  The Debtors will disregard bids that are conditioned on obtaining financing or on the outcome of unperformed due diligence by the bidder other than such due diligence as is contemplated in the CCI Purchase Agreement.

Provided that it otherwise meets the applicable requirements above, the CCI Purchase Agreement shall constitute a Qualified Bid.

(f)     **Auction.**

(i)      Prior to the Auction, the Debtors, through their counsel, shall evaluate any Qualified Bids submitted in accordance with these procedures and, through their counsel, shall select the offer, if any, which they determine in their business judgment, is the higher and/or best offer for the Purchased Assets.  The Debtors may take circumstances other than simply the Purchase Price into consideration when evaluating the Qualified Bid of any Qualified Bidder.  The Qualified Bid of any Qualified Bidder other than CCI must meet the cash consideration outlined in Paragraph (c)3. to be considered (the "Initial Accepted Offer").

(ii)     If there is at least one Qualified Bid other than the Initial Accepted Offer, the Debtors may conduct an auction (the "Auction") with respect to the Purchased Assets. The Auction shall commence at 10:00 a.m. on April 29, 2019 (the "Auction Date") at the offices Debtors' counsel, Lynn M. Brimer, Strobl Sharp PLLC, 300 E. Long Lake Rd., Suite 200, Bloomfield Hills, Michigan 48304.  The Debtors shall notify all Qualified Bidders who have submitted Qualified Bids of the time and place of the Auction.   Only a Qualified Bidder who has submitted a Qualified Bid is eligible to participate at the

Auction. The Debtors reserve the right to adjourn the Auction from time to time by announcement at the Auction.

(iii) The Debtors may conduct the Auction without the assistance of a separately retained auctioneer. The Auction may be continued from day to day as determined by the Debtors. The Auction shall be conducted by the Debtors in a manner calculated by them in their sole discretion to achieve the higher and/or best offer for the Purchased Assets, in accordance with the other terms herein.

(iv) Upon conclusion of the bidding, the Auction shall be closed. The Debtors shall immediately review each Qualified Bid(s) on the basis of financial and contractual terms and the factors relevant to the sale process, including those factors affecting the speed and certainty of consummating the sale. In the event the Debtors, through their counsel, determine that one of the Qualified Bids received represents (i) fair consideration, and (ii) the highest or otherwise best offer for the Purchased Assets, the Debtors, through their counsel, shall present that Qualified Bid (the "Successful Bid") to the Bankruptcy Court for approval at the Sale Hearing, substituting (if necessary) the Qualified Bid for the CCI Purchase Agreement as an Exhibit to the Sale Motion, and seeking authority to consummate a sale transaction with the party asserting such Successful Bid (the "Successful Bidder").

(v) The acceptance of a Qualified Bid by the Debtors, through their counsel, or the acceptance of no Qualified Bids by the Debtors at the Auction, shall not constitute or be deemed a rejection of any other Qualified Bids, except insofar as such Qualified Bids are revocable in accordance with these procedures.

(g) **<u>Closing.</u>**

(i) Unless otherwise ordered by the Court, closing on the Purchased Assets shall occur in accordance with the terms of the Successful Bid.

9

(ii)    In the event closing does not occur in accordance with the material terms of the Successful Bid, then within five (5) business days after the scheduled closing date, the Debtors, through their counsel, shall notify the party that submitted the next highest or otherwise best offer for the Purchased Assets other than the Successful Bid that its Qualified Bid is accepted and that its bid has become the Successful Bid (the "New Successful Bid"). Closing on the New Successful Bid shall occur within fourteen (14) days after it receipt of the Debtors notification by the new Successful Bidder.

(iii)    In the event CCI is not the Successful Bidder and pursuant to the other terms of the CCI Purchase Agreement, CCI shall be entitled to a break-up fee of Thirty Thousand and 00/100 Dollars ($30,000.00) at the closing (the "Break-Up Fee").

(h)    **Escrow of Good Faith Deposits.** The Good Faith Deposits of all Qualified Bidders, (except for the Successful Bidder) shall be held in a segregated escrow account until the earlier of the Closing of the sale of the Purchased Assets or May 7, 2019. If a Successful Bidder fails to consummate an approved sale because of a breach or failure to perform on the part of such Successful Bidder, the Debtors shall be entitled to retain the Good Faith Deposit as liquidated damages resulting from the breach or failure to perform by the Successful Bidder. The Debtors shall return all good faith deposits immediately upon closing or May 7, 2019, whichever is earlier.

(i)    Notwithstanding anything herein to the contrary the Debtors shall be permitted to effectuate a sale of any assets without employing the foregoing procedures, so long as such sale is approved by the Court in accordance with the Bankruptcy Code, the Bankruptcy Rules, and the Local Rules of this Court.

(j)    All insider relationships between any Qualified Bidder and the Debtors shall be disclosed in the Qualified Bid and the Sale Agreement and/or Successful Bid presented to the Court. In the event a Potential Bidder is, or is owned, controlled, or employed by, the Debtor or any insider thereof, said bidder (or its owner, controller or employer) shall have no input in the deliberative process in connection with the applicable Group or the qualification of any

10

potential bidders with respect thereto.

12.    The Debtors shall actively market the Purchased Assets to known parties who may have an interest in the Purchased Assets or have previously submitted offers on the Purchased Assets, and shall advertise the Purchased Assets for sale in a weekend edition of an appropriate newspaper of general distribution for two weeks prior to the Auction Date.

13.    **Requirements for Auction Notice.**  The Debtors will cause a notice of these proposed Bidding Procedures and of the Auction, in the form of **Exhibit C** hereto (the "Auction Notice"), to be sent to all parties listed on the Matrix of each of the jointly administered cases (the "Matrix"), as further described herein.  In the event the Debtors receive any inquiry regarding the Auction, the Auction Notice will be immediately sent to those persons who have contacted or have been contacted by the Debtors with respect to a potential purchase of the Purchased Assets, as well as all other entities that the Debtors believe, in their business judgment, may have an interest in acquiring the Purchased Assets.  Moreover, the Debtors may publish the material terms of the Auction Notice using any media source(s) to the extent that, in the exercise of their business judgment, they believe that such publication would facilitate competitive bidding that would realize an increase in the net value of the Purchased Assets.  The Auction Notice provides that objections to the Debtors' Motion for approval of the procedures for the sale

of the Purchased Assets must be served on counsel for the Debtors on or before May 1, 2019.

## NOTICE OF ASSUMPTION AND ASSIGNMENT OF EXECUTORY CONTRACTS AND OBJECTION DEADLINE

14.     Debtors have contracts that are necessary to the successful operation of Debtors' businesses.  Conversely, Debtors may have contracts associated with their Businesses or the Purchased Assets that may interfere with the sale or are deemed detrimental to their estates, and upon sale of the Purchased Assets will no longer be beneficial to Debtors.

15.     Debtors will provide all Qualified Bidders with a list and a copy of all contracts and leases related to the Purchased Assets, along with proposed cure amounts owing on each contract and lease (the "Cure Schedule"). All Qualified Bidders must provide with their Qualified Bids to Debtors a list of the contracts and leases that it would like Debtors to assume and assign to the Qualified Bidder (the "Assumed Contracts and Assumed Leases") (together, the "Contract Lists").

16.     Debtors are requesting that the following procedures be approved by the Bankruptcy Court for the assumption and assignment of Assumed Contracts and Assumed Lease ("Assumption and Assignment Procedures");

(a)     On or before April 16, 2019, Debtors shall serve on the counterparties to the contracts on the Contract Lists a notice (the "Assumption and Assignment Notice") in the form attached as **Exhibit D** containing the following information:

12

(i) Debtors' intent to assume and assign the Assumed Contracts and Assumed Leases to CCI or a Successful Bidder;

(ii) The Cure Schedule (as supplemented pursuant to the procedure described below);

(iii) The cure amount Debtors propose to pay, if applicable, to each counterparty in compliance with the key requirements of Section 365 of the Bankruptcy Code (the "Pre-Petition Cure Amount");

(iv) That the counterparties to the Assumed Contracts and Assumed Leases shall file and serve any objections to the assumption and assignment of the Assumed Contracts and Assumed Leases or the Pre-Petition Cure Amount on or before the Assumption/Assignment Objection Deadline, as described below; and

(v) That for each Assumed Contract and Assumed Lease for which an objection is timely received, a hearing will be held at the Sale Hearing, or such other date as the Court may designate, upon twenty-four (24) hours' telephonic, electronic or facsimile notice to the objecting party; provided, however, that if the Assumed Contracts and Assumed Leases that are the subject of objections are assumed and assigned prior to the time of the hearing, the cure amount asserted by the objecting party or such other amount as may be agreed to by the parties or fixed by the Court, will be held in a segregated account by the Successful Bidder or Debtors pending further order of the Court or mutual agreement of the parties.

(b) The counterparties to the Assumed Contracts and Assumed Leases shall file any objections to the assumption and assignment of the Assumed Contracts and Assumed Leases or the Pre-Petition Cure Amount on or before May 1, 2019 (the "Assumption/Assignment Objection Deadline") and shall serve such objection so that the objection is actually received by: (i) counsel for Debtors; (ii) counsel to CCI; (iii) the Office of the United States Trustee; (iv) counsel for Chemical Bank; and (v) any unsecured creditors committee if one is formed, by the Assumption/Assignment Objection Deadline. Any and

13

all objections must state with detail: the grounds for the objection; if the objecting party proposes an alternative cure amount and the amount thereof; and the basis for the calculation of the proposed alternative amount;

(c)     Any party who fails to object by the Assumption/Assignment Objection Deadline shall be forever barred from objecting to the assumption and assignment of its respective executory contract or unexpired lease;

(d)     Debtors will make cure payments within thirty (30) days after the date of the closing of the sale of the Purchased Assets and any letters of credit associated with any assumed contract or assumed lease will be replaced by a new letter of credit provided by the Successful Bidder; and

(e)     Debtors may file one or more supplemental list or lists of Assumed Contracts and Assumed Leases (the "Supplemental List"), if necessary. Debtors' shall serve to the counterparties to the Assumed Contracts and Assumed Leases on the Supplemental List a supplemental Assumption and Assignment Notice substantially in the form and containing the information described above. The counterparties to contracts and leases on the Supplemental List shall have five (5) calendar days to file an objection in accordance with the requirements outlined above and serve upon the parties described above.

17.     Debtors propose the following procedure for rejection of contracts:

(a)     Promptly after both the receipt of the Contract Lists from the Successful Bidder and Closing, Debtors will notify each counter-party to a contract that will be rejected of such rejection (the "Rejection Notice"). Notice shall be effective upon mailing. Objections, if any, to the rejection (a "Rejection Objection") must be filed and served on counsel for Debtors, US Trustee, Chemical Bank and any unsecured creditors committee if one is formed, within fourteen (14) days after the Rejection Notice was mailed (the "Rejected Contract Deadline");

(b)     Upon receipt of a timely Rejection Objection, Debtors may request that the Bankruptcy Court set a hearing on the Rejection Objection. If

14

the Bankruptcy Court authorizes the rejection, the rejection shall be deemed to have been effective upon the date the sale of the Purchased Assets is closed, unless otherwise determined by the Bankruptcy Court;

(c)     Any party who fails to object by the Rejected Contract Deadline shall be barred from objecting to the rejection of the contract. In such instances, rejections of executory contracts or unexpired leases will be effective upon notice to the party that its contract or unexpired leases has been rejected.

18.     Debtors submit that the foregoing procedures and notices are reasonably calculated to provide the appropriate parties with timely and adequate notice and opportunities to object to Debtors' proposed assignment and assumption of the Assumed Contracts and Assumed Leases and/or rejection of certain contracts. Debtors further submit that such notice constitutes good and sufficient notice under the circumstances with respect to the assumption and assignment of the Assigned Contracts and Assumed Leases and/or the rejection of certain contracts as proposed in this Motion, and that no further notice need be given.

## SUMMARY OF PROPOSED DATES AND KEY EVENTS

19.     Subject to Bankruptcy Court approval, Debtors propose to establish the following timetable:

| *Proposed Date* | *Proposed Event* |
|---|---|
| April 16, 2019 | Entry of Bid Procedures Order |
| April 20 and 27, 2019 | Publish Notice |
| April 16, 2019 | Serve Auction Notice |
| April 16, 2019 | Serve Assumption Notice |
| April 26, 2019 | Deadline for Qualified Bids |

15

| April 29, 2019 | Auction |
| May 1, 2019 | Deadline for Objections to Sale and Assumptions |
| May 3, 2019 | Sale Hearing |

These dates are subject to approval of the Bankruptcy Court and may be changed in subsequent orders entered by the Court. Additionally, Debtors reserve the right to request that these dates be revised.

**BASIS FOR RELIEF REQUESTED**

**A.     The proposed Sale is Authorized under §363 of the Bankruptcy Code.**

20.     Section 363(b)(1) of the Bankruptcy Code permits a debtor-in-possession, after notice and a hearing, to "use, sell, or lease, other than in the ordinary course of business, property of the estate…." 11 U.S.C. §363(b)(1).

21.     In approving a sale under 11 U.S.C. §363(b), the Sixth Circuit Court of Appeals has held that there must be "some articulated business justification" supporting the decision to sell assets, and that a court must consider "all salient factors" pertaining to the proposed Sale. *Stephens Industries, Inc. v. McClung*, 789 F.2d 386, 389 (6th Cir. 1986).

22.     The proposed Sale of the Purchased Assets to the Successful Bidder satisfies the applicable requirements of §363. The Debtors are relying on their business judgment in their decision to sell the Purchased Assets. The Debtors lack the necessary capital to continue their operations and, therefore, have concluded in

their business judgement that a competitive bidding process for the Purchased Assets on a going-concern basis will provide the greatest return to their Creditors.

23.    Moreover the Debtors have worked with Chemical Bank, their sole secured creditor, to develop the Bidding Procedures.    The proposed Bidding Procedures will result in fair and reasonable value being realized for the Purchased Assets.  The Stalking Horse Bid submitted by CCI in the form of the CCI Purchase Agreement establishes a "floor" Purchase Price for the Purchased Assets and will serve as a baseline bid that the Debtors will use to solicit other Qualified Bids from third parties.  By testing the Purchase Price of CCI Bid in the market, the Bidding Procedures and the Auction are designed to ensure that the Debtors maximize the value of the Purchased Assets.

24.    Prior to the filing of Debtors Chapter 11 cases the Debtors marketed their Purchased Assets to potential purchasers.  Notice of the Auction shall be served on all parties who have demonstrated an interest in the Purchased Assets.

25.    The CCI Purchase Agreement and Bidding Procedures are the result of extensive good faith, arms-length negotiations between the Debtors and CCI.

26.    The Debtors seek permission to sell the Purchased Assets free and clear of all liens, claims, interests and encumbrances (collectively, the "Liens"), with such Liens attaching to proceeds.

27.     Section 363(f) of the Bankruptcy Code states that property may be sold free and clear of any interest in property if:

(a)     applicable nonbankruptcy law permits sale of such property free and clear of such interest;

(b)     such entity consents;

(c)     such interest is a lien and the price at which such property is sold is great than the aggregate value of all liens on such property;

(d)     such interest is a bona fide dispute; or

(e)     such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

11 U.S.C. §363(f).

28.     Debtors need only satisfy one of the requirements of §363(f).

29.     Otherwise, §363(f)(5) of the Bankruptcy Code allows a debtor to sell property free and clear of liens when a legal or equitable proceeding could compel the lienholder to accept less than full money satisfaction for its interest. *See In re Grand Sale U.S.A.*, 178 B.R. 460, 462 (E.D. Mich. 1995) ("Thus, it is clear that Section 363(f)(5) allows trustees of an estate to sell property free and clear of liens when 'a legal or equitable proceeding' exists that will force the lienholder to accept less than full money satisfaction for their interest.").

30.     Debtors propose that any valid Liens attach to the sale proceeds received for the Purchased Assets with the same order of priority, validity, force and effect that such Lien had before the Sale.

31.     While the Bankruptcy Code does not define what is a "good faith purchaser," many courts, including the Sixth Circuit Court of Appeals, have adopted a traditional equitable definition of "one who purchases the assets for value, in good faith, and without notice of adverse claims." *See Made in Detroit, Inc. v. Official Common. Of Unsecured Creditors (In re Made in Detroit, Inc.)*, 414 F.3d 576, 581 (6th Cir. 2005) (quoting *In re Rock Indus. Mach. Corp.*, 572 F.3d 1195, 1197 (7th Cir. 1978)).  Accordingly, in order to be considered a "good faith purchaser" under §363(m), the purchaser "must demonstrate that it purchased the property 'in good faith' and that it did so 'for value.'" *In re Made in Detroit, Inc.*, 414 F.3d at 581 (quoting *Cumberland Farms Dairy, Inc. v. Nat'l Farmers Org., Inc. (In re Abbotts Dairies of Penn., Inc.)*, 788 F.2d 143, 147 (3d Cir. 1986)). There is no dispute that CCI will tender a substantial Purchase Price for the Purchased Assets.

32.     In order to show a lack of good faith, the Sixth Circuit requires a showing of "fraud or collusion between the purchaser and the seller or the other bidders, or that the purchaser's actions constituted 'an attempt to take grossly unfair advantage of other bidders.'" *255 Park Plaza Assocs. Ltd. P'ship v. Conn. Gen. Life Ins. Co. (In re 255 Park Plaza Assocs. Ltd. P'ship)*, 100 F.3d 1214, 1218 (6th Cir. 1996) (quoting *In re Onouli-Kona Land Co. v. Estate of Richards (In re Onouli-Kona Land Co.)*, 846 F.2d 1170, 1173 (9th Cir. 1988)) (additional citations

19

omitted). Facts purporting to demonstrate lack of good faith are not present here. CCI is represented by competent counsel. The CCI Purchase Agreement and proposed Bidding Procedures are the result of arm's length and good faith negotiations between the parties and are designed to prevent any collusive activity.

33. Accordingly, CCI is a good faith purchaser within the meaning of §363 (m) of the Bankruptcy Code.

**B. The Proposed Assumption and Assignment of Executory Contracts Complies with §365 of the Bankruptcy Code**

34. To facilitate the sale of the Purchased Assets as outlined in this Sale Motion, Debtors seek authority to assume and assign certain executory contracts and unexpired leases to the Successful Bidder to the extent required by the Success Bid.

35. Section 365 of the Bankruptcy Code authorizes a debtor to assume and assign an executory contract or unexpired lease, subject to the approval of the bankruptcy court, provided that any defaults under such executory contractor or unexpired lease are cured and the assignee provides adequate assurance of future performance.

36. The decision to assume or reject an executory contract or unexpired lease is examined under the business judgement standard. *See, e.g., In re Stable Mews Association, Inc.*, 41 B.R. 594, 596 (Bankr. S.D.N.Y. 1983); *Software*

*Customizer v. Bullet Jet Charter (n re Bullet Jet Charter)*, 72 B.R. 845, 846 (Bankr. W.D. Pa. 1987).

37.     Debtors believe that the Purchase Price of the Purchased Assets will be maximized if Debtors agree to assume and assign to the Successful Bidder the certain executory contracts and leases as set forth in the CCI Purchase Agreement.

38.     Accordingly, Debtor's business rationale for seeking to assume and assign certain executory contracts is the same as their rationale for conducting the proposed Sale – Debtors believe that the sale of their Purchased Assets, including the identified unexpired contract rights, will maximize the value of their estates for the benefit of their creditors.

39.     Debtors believe that all of the requirements under §365 of the Bankruptcy Code for the assumption and assignment of certain executory contracts and leases will be satisfied by the proposed Assumption and Assignment Procedures.

40.     To the extent that defaults exist under any of certain executory contracts and leases, such defaults will be cured by the payment of the cure amounts by the Successful Bidder.

41.     As required by the Bidding Procedures, the financial wherewithal of each bidder will be evaluated before such bidder is allowed to participate in the Auction.

42. Accordingly, Debtors believe that the Successful Bidder will be able to provide adequate assurance of future performance under each of the certain executory contracts and leases.

## C. The Proposed Bidding Procedures are Appropriate Under the Circumstances

43. The Bidding Procedures are the result of good faith, arms-length negotiation between Debtors and CCI.

44. It has long been recognized by bankruptcy courts that a competitive bidding process is the best way to realize the highest value for a debtor's assets. *See, e.g., In re Bidermann Indus.  U.S.A., Inc.*, 203 B.R. 547, 551 (Bankr. S.D.N.Y. 1997).  The proposed Bidding Procedures reflect an understanding of this principle by facilitating competitive bidding for the Purchased Assets.

45. The proposed Bidding Procedures contain certain limitations on participants in the Auction, which are designed to maximize the efficiency of the Auction process.  For example, each potential Bidder must meet certain financial disclosures and other information acceptable to the Debtors to become a Qualified Bidder.

46. By limiting participation in the Auction to Qualified Bidders, delineating requirements for being designated as a Qualified Bidder, and establishing an overbid requirement, the proposed Bidding Procedures will discourage bidding by parties other than those with the ability to close on the Sale.

22

Such requirements are not onerous and will likely not discourage legitimate Auction participants from submitting bids.

47.     A debtor's business judgment is entitled to substantial deference with respect to the procedures used in selling assets of its estate.  *See In re Integrated Resources, Inc.*, 147 B.R. 650, 656-57 (S.D.N.Y. 1992).

48.     Here, the proposed Bidding Procedures create a process for fully competitive bidding among the parties most likely to have an interest in purchasing the Purchased Assets and will maximize the value to the Debtors' estates.

**D.      The Break-Up Fee is Appropriate Under the Circumstances**

49.     The Break-Up Fee was the product of arms' length negotiations between Debtors and CCI, and the Break-Up Fee is fair and reasonable under the circumstances.

50.     CCI has incurred and will incur costs, expenses, and risks associated with entering into the Asset Purchase Agreement and submitting CCI Bid.  CCI was not willing to engage in such negotiations unless Debtors agreed to provide for a Break-Up Fee in the negotiated CCI Asset Purchase Agreement.

51.     These expenses are not limited to ordinary due diligence.  In this case, CCI has incurred significant expenses associated with the negotiation and preparation of sale documents, as well as bankruptcy pleadings necessary to consummate the Sale.

23

52.     The requirements in the Bidding Procedures that a qualified Bidder submit a bid with a cash Purchase Price not less than $555,000.00 provides the Debtors' estates with sufficient funds to pay the Break-Up Fee.

53.     Approval of bid protections in connection with the sale of assets under 11 U.S.C. §363 is an accepted practice.  Bankruptcy courts have approved bidding incentives similar to the Break-Up Fee under the "business judgment rule," which proscribes judicial second-guessing of the actions of a debtor taking in good faith and in the exercise of honest judgment.  *In re 995 Fifth Ave. Assocs., L.P.*, 96 B.R. 24, 28 (Bankr. S.D.N.Y. 1989) (bidding incentives may be "legitimately necessary to convince a white knight to enter the bidding by providing some form of compensation for the risks it is undertaking.")

54.     Generally break-up fees are rejected only when such fees will place undo burden on the debtor's estate.  *In re Hupp Indus.*, 140 B.R.191, 196 (Bankr. N.D. Ohio 1992) ("bidding incentives such as break-up fees and bid increment limitations are carefully scrutinized in §363(b) asset sales to insure that the debtor's estate is not unduly burdened and that the relative rights of the parties in interest are protected.").

55.     In this case, the proposed Break-Up Fee (a) will not place an undue burden on Debtors' estates since it is payable solely from the proceeds of an alternative transaction; (b) is reasonable, (c) will enable the Debtors to maximize

24

the value of the Purchased Assets; and (d) does not burden the relative rights of parties in interest because these parties will be given an opportunity to be heard on the propriety of the Break-Up Fee.

56.     Debtors believe there is ample justification for the proposed Break-Up Fee which under the circumstances is fair and reasonable.

57.     Accordingly, the proposed Break-Up Fee should be approved as an administrative expense pursuant to §503(b) of the Bankruptcy Code.

**E.     Reservation of Rights; Deadline Extensions**

58.     Debtors reserve the right to modify the Bidding Procedures or impose, at or before the Auction, additional customary terms and conditions on the sale of the Purchased Assets, including, without limitation, extending the deadlines set forth in the Bidding Procedures, modifying bidding increments, adjourning or canceling the Auction or Sale, all without further notice.

<u>**WAIVER OF FED. R. BANK. P. 6004(g) and 6006(d)**</u>

59.     Due to the need to transition the Purchased Assets as quickly as possible in order to maintain the Debtors' goodwill, Debtors assert that cause exists to waive the requirements of Fed. R. Bankr. P. 6004(g) and 6006(d), and Debtors request that the Order approving the sale (as well as the assumption and assignment of the Assumed Contracts and Assumed Leases) provide that it shall be effective immediately and that the 10-day stay shall not apply to the sale

transaction (and the assumption and assignment of the Assumed Contract and Assumed Leases).

<b><u>NOTICE</u></b>

60.     No trustee or examiner has been appointed in this Chapter 11 case and no Unsecured Creditors Committee has been designated.

61.     A complete copy of this Motion has been served by electronic mail, if available, first class mail, hand delivery, facsimile, or overnight mail upon (i) all creditors identified on the Matrix of each of the jointly administered cases; (ii) the Office of the United States Trustee; (iii) counsel for Chemical Bank; (iv) counsel for CCI; (v) all non-debtor parties to executory contracts and (vii) all parties who have requested notice in the case or have expressed an interest in the purchase Assets.

<b><u>NO PRIOR RELIEF REQUESTED</u></b>

62.     No prior request for the relief sought in this Motion has been made to this or any other court.

DEBTORS REQUEST that this Court enter the Bidding Procedures Order attached as **Exhibit A:**

(a)     Approving the form of the Proposed Purchase Agreement for bidding purposes only, and the sale to a Stalking Horse prior to the Auction and pursuant to a purchase agreement in a form substantially the same as the Proposed Purchase Agreement, subject to higher and better offers;

26

(b)     Approving the Bidding Procedures:

(c)     Approving the Break-up Fee;

(d)     Scheduling the Sale Hearing;

(e)     Approving the form and manner of the Auction Notice;

(f)     Approving the Assumption and Assignment Procedures; and

(g)     Approving the form and manner of Assumption and Assignment
        Notice.

                                        Respectfully Submitted,

                                        STROBL SHARP PLLC

                                        By:     /s/     Lynn M. Brimer_____
                                        LYNN M. BRIMER (P43291)
                                        PAMELA S. RITTER (P47886)
                                        JAMES M. McARDLE (P82443)
                                        Strobl Sharp PLLC
                                        Attorneys for Debtor
                                        300 East Long Lake Road, Suite 200
                                        Bloomfield Hills, MI 48304-2376
                                        Telephone:  (248) 540-2300
                                        Facsimile: (248) 645-2690
                                        E-Mail: lbrimer@stroblpc.com

Dated:  April 2, 2019

S&B/12121/002/PLDG/SB673348.DOC

**EXHIBIT A**

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

In re:

**K&D INDUSTRIAL SERVICES**    **Case No. 19-43823**
**HOLDING CO., INC., et al,[1]**    **Chapter 11**
                                 **Hon. Phillip J. Shefferly**

      **Debtor.**

---

**PROPOSED ORDER GRANTING**
**DEBTORS' MOTION FOR ENTRY OF ORDER (A) ESTABLISHING**
**BIDDING PROCEDURES FOR THE AUCTION SALE OF CERTAIN ALL**
**OF DEBTORS' ASSETS FREE AND CLEAR OF LIENS, CLAIMS AND**
**ENCUMBRANCES AND TRANSFERRING LIENS TO PROCEEDS; (B)**
**SCHEDULING AN AUCTION AND A SALE HEARING TO CONSIDER**
**APPROVAL OF SALE; (C) ESTABLISHING PROCEDURES FOR THE**
**ASSUMPTION AND ASSIGNMENT OF EXECUTORY CONTRACTS; (D)**
**APPROVING THE FORM OF ASSET PURCHASE AGREEMENT, FORM**
**AND MANNER OF THE AUCTION NOTICE, THE FORM OF THE**
**NOTICE TO NON-DEBTOR CO-PARTIES TO EXECUTORY**
**CONTRACTS, AND THE NOTICE OF THE SALE HEARING**

This matter is presented on the Debtors' Motion for Entry of an Order

pursuant to 11 U.S.C. §363 and §365 and Federal Rules of Bankruptcy Procedure

2002, 9006, 6004 and L.B.R. 6004-1 and 9014-1 (A) Establishing Bidding

Procedures for the Auction Sale of certain of Debtors' Assets Free and Clear of

---

[1] The Debtors in these jointly administered proceedings are K&D Industrial Services Holding Co., Inc. (Case No. 19-43823), K&D Industrial Services, Inc. (Case No. 19-43824), K&D Industries, Inc. (Case No. 19-43825), K&D Grand Rapids, Inc. (Case No. 19-43826), K&D Industries of Ohio, Inc. (Case No. 19-43827), K&D Industrial Services Midwest, Inc. (Case No. 19-43828), K&D Industries West, Inc. (Case No. 19-43829), and L&P Industries LLC (Case No. 19-43830).

1

Liens, Claims and Encumbrances and Transferring Liens to Proceeds; (B) Scheduling an Auction and a Sale Hearing to Consider Approval of Sale; (C) Establishing Procedures for the Assumption and Assignment of Executory Contracts; (D) Approving the Form of Asset Purchase Agreement, Form and Manner of the Auction Notice, the Form of the Notice to Non-Debtor Co-Parties to the Executory Contracts, and the Notice of Sale Hearing (the "Motion"), and state:

The Court has considered the Motion and the matters reflected in the record of the hearing held on the Motion, if any. The Court having jurisdiction over this proceeding; that this is a core proceeding; notice of this Motion has been provided to those entitled to receive service; the relief sought in the Motion is in the best interests of the Debtors, their estates, and creditors; and good and sufficient cause exists for such relief.

**NOW THEREFORE,**

**IT IS HEREBY ORDERED** that the Motion is GRANTED.

**IT IS HEREBY ORDERED** that the form of Asset Purchased Agreement attached to the Motion as Exhibit B is approved for purposes of the Bidding Procedures only.

**IT IS FURTHER ORDERED** that Bidding Procedures are approved as follows:

2

**(I)    BIDDING PROCEDURES.**

(a)    **Participation Requirements.** Unless otherwise ordered by the Court, each person (a "Potential Bidder") interested in participating in the sale process must deliver by the second (2nd) Business Day before the Bid Deadline to counsel for the Debtors, Lynn M. Brimer, Strobl Sharp PLLC, 300 E. Long Lake Rd., Ste. 200, Bloomfield Hills, MI 48304, such financial statements, financing commitments, or other documents as the Potential Bidder believes provide adequate assurance to the Debtors and their advisors of such Potential Bidder's ability to close on a purchase of the Purchased Assets (the "Transaction"). As used herein, the term "Business Day" shall mean a day on which the Court is open.

(b)    **Definition of Qualified Bidder.** Unless otherwise ordered by the Bankruptcy Court for cause shown, a Potential Bidder, shall become a "Qualified Bidder" if the Potential Bidder delivers to counsel for the Debtors on or prior to the Bid Deadline, as described below, the following:

(i)    Financial disclosures and other information acceptable to the Debtors, to demonstrate such Potential Bidder's financial and other abilities to consummate a sale with respect to any expected bid;

(ii)   A fully executed asset purchase agreement (which must be in the form of the CCI Purchase Agreement) which provides, among other things, that any Qualified Bid (as defined below, and any bid made subsequently thereto) made by such Potential Bidder with respect to the Purchased Assets shall be irrevocable until a sale of the Purchased Assets is fully consummated by the Debtors regardless of whether the sale occurs to the Potential Bidder or another party (but in no event later than thirty (30) days after the Auction Date without the consent of both parties);

(iii)  A Qualified Bid (as defined below), in writing and signed by the Potential Bidder and any other persons against whom the Potential Bidder intends that the bid can be enforced, including but not limited to guarantors (an "Initial Qualified Bid"), must be delivered to counsel for the Debtors addressed to the person

3

stated in the Notice at the address stated in the Notice, not later than the date and time of the Bid Deadline, and such other persons as appear on the Notice; and

(iv)     A certified check or wired funds in an amount equal to Fifty-Five Thousand and 00/100 Dollars ($55,000.00). The Deposit shall be subject to the jurisdiction of the Bankruptcy Court. (Any of the above possible deposits referred to herein as a "Good Faith Deposit").

CCI is automatically considered a Qualified Bidder without further action or consideration.

(c)     **Due Diligence.**  The Debtors are not responsible for, and will bear no liability with respect to, any information obtained by any Qualified Bidder in connection with the sale of the Purchased Assets unless such Qualified Bidder becomes the Successful Bidder and such liability and responsibility is provided for in the agreement evidencing the Transaction between the Debtors and the Successful Bidder and such agreement is approved by the Court.

(d)     **Bid Deadline.**  A Qualified Bidder who desires to make a bid shall advise and deliver a bid to counsel for the Debtors, Lynn M. Brimer, Strobl Sharp PLLC, 300 E. Long Lake Rd., Ste. 200, Bloomfield Hills, MI 48304, no later than 5:00 p.m. (prevailing Eastern Time) on April 26, 2019 (the "Bid Deadline").

(e)     **Definition of Qualified Bid.**  Unless otherwise ordered by the Bankruptcy Court for cause shown, a bid shall become a "Qualified Bid" only if the following occurs:

(i)     The bid must be made by a Qualified Bidder.

(ii)     The bid must be substantially in the form of the CCI Purchase Agreement attached as **Exhibit B** to the Motion, or as amended from time to time.  The Debtors believe that the terms and conditions of the CCI Purchase Agreement are in the best interest of the estate.  If a bid deviates from the CCI Purchase Agreement in any manner, the Qualified Bidder must also provide, at the time of submission of the bid, a black-lined copy

4

of the CCI Purchase Agreement to indicate the relevant changes.

(iii)    The minimum aggregate consideration to be received by the Debtor in the bid shall equal or exceed the Purchase Price in the CCI Purchase Agreement plus the break-up fee of Thirty Thousand and 00/100 Dollars ($30,000.00) (the "Break-Up Fee"), plus Twenty-Five Thousand and 00/100 Dollars ($25,000.00). All subsequent bids must be in increments of at least Thirty-Five Thousand and 00/100 Dollars ($35,000.00).

(iv)    The bid must include written evidence of a commitment for financing or other evidence of the ability to consummate the Transaction satisfactory to the Debtors with appropriate contact information for such financing sources.

(v)    The bid shall contain no material additional contingencies or material requirements binding the Debtors, including but not limited to financing contingencies or contingencies relating to the outcome of due diligence. The Debtor will disregard bids that are conditioned on obtaining financing or on the outcome of unperformed due diligence by the bidder other than such due diligence as is contemplated in the CCI Purchase Agreement.

Provided that it otherwise meets the applicable requirements above, the CCI Purchase Agreement shall constitute a Qualified Bid.

(f)    **Auction**.

(i)    Prior to the Auction, the Debtors, through their counsel, shall evaluate any Qualified Bids submitted in accordance with these procedures and, through counsel, shall select the offer, if any, which they determine in their business judgment, is the higher and/or best offer for the Purchased Assets. The Debtors may take circumstances other then simply the Purchase Price into consideration when evaluating the Qualified Bid of any Qualified Bidder The Qualified Bid of any Qualified Bidder other than Joe Site must meet the cash consideration outlined in Paragraph (c)3. To be considered (the "Initial Accepted Offer").

5

(ii)     If there is at least one Qualified Bid other than the Initial Accepted Offer, the Debtors may conduct an auction (the "Auction") with respect to the Purchased Assets. The Auction shall commence at 10:00 a.m. on April 29, 2019 (the "Auction Date") at the offices Debtors' counsel, Lynn M. Brimer, Strobl Sharp PLLC, 300 E. Long Lake Rd., Suite 200, Bloomfield Hills, Michigan 48304.  The Debtors shall notify all Qualified Bidders who have submitted Qualified Bids of the time and place of the Auction.  Only a Qualified Bidder who has submitted a Qualified Bid is eligible to participate at the Auction.  The Debtors reserve the right to adjourn the Auction from time to time by announcement at the Auction.

(iii)    The Debtors may conduct the Auction without the assistance of a separately retained auctioneer. The Auction may be continued from day to day as determined by the Debtors.  The Auction shall be conducted by the Debtors in a manner calculated by them in their sole discretion to achieve the higher and/or best offer for the Purchased Assets, in accordance with the other terms herein.

(iv)    Upon conclusion of the bidding, the Auction shall be closed. The Debtors shall immediately review each Qualified Bid(s) on the basis of financial and contractual terms and the factors relevant to the sale process, including those factors affecting the speed and certainty of consummating the sale.  In the event the Debtors, through their counsel, determine that one of the Qualified Bids received represents (i) fair consideration, and (ii) the highest or otherwise best offer for the Purchased Assets, the Debtors, through their counsel, shall present that Qualified Bid (the "Successful Bid") to the Bankruptcy Court for approval at the Sale Hearing, substituting (if necessary) the Qualified Bid for the CCI Purchase Agreement, and seeking authority to consummate a sale transaction with the party asserting such Successful Bid (the "Successful Bidder").

(v)     The acceptance of a Qualified Bid by the Debtors, through their counsel, or the acceptance of no Qualified Bids by the Debtors at the Auction, shall not constitute or be deemed a rejection of

any other Qualified Bids, except insofar as such Qualified Bids are revocable in accordance with these procedures.

(g) **<u>Closing.</u>**

    (i)    Unless otherwise ordered by the Court, closing on the Purchased Assets shall occur in accordance with the terms of the Successful Bid.

    (ii)    In the event closing does not occur in accordance with the material terms of the Successful Bid, then within five (5) business days after the scheduled closing date, the Debtors, through their counsel, shall notify the party that submitted the next highest or otherwise best offer for the Purchased Assets other than the Successful Bid that its Qualified Bid is accepted and that its bid has become the Successful Bid (the "New Successful Bid"). Closing on the New Successful Bid shall occur within fourteen (14) days after it receipt of the Debtors notification by the new Successful Bidder.

    (iii)    In the event CCI is not the Successful Bidder and pursuant to the other terms of the CCI Purchase Agreement, CCI shall be entitled to the Break-Up Fee.

(h) **<u>Escrow of Good Faith Deposits.</u>** The Good Faith Deposits of all Qualified Bidders (except for the Successful Bidder) shall be held in a segregated escrow account until the earlier of the Closing of the sale of the Purchased Assets or May 7, 2019. If a Successful Bidder fails to consummate an approved sale because of a breach or failure to perform on the part of such Successful Bidder, the Debtors shall be entitled to retain the Good Faith Deposit as liquidated damages resulting from the breach or failure to perform by the Successful Bidder. The Debtors shall return all good faith deposits immediately upon closing or May 7, 2019, whichever is earlier.

(i) Notwithstanding anything herein to the contrary the Debtors shall be permitted to effectuate a sale of the Purchased Assets without employing the foregoing procedures, so long as such sale is approved by the Court in accordance with the Bankruptcy Code, the Bankruptcy Rules, and the Local Rules of this Court.

7

(j)    All insider relationships between any Qualified Bidder and the Debtors shall be disclosed in the Qualified Bid and the Sale Agreement and/or Successful Bid presented to the Court. In the event a Potential Bidder is, or is owned, controlled, or employed by, the Debtors or any insider thereof, said bidder (or its owner, controller or employer) shall have no input in the deliberative process in connection with the applicable Group or the qualification of any potential bidders with respect thereto.

**IT IS FURTHER ORDERED** that the Debtors shall actively market the Purchased Assets to known parties who may have an interest in the Purchased Assets, or have previously submitted offers on the Purchased Assets, and shall advertise the Purchased Assets for sale in a weekend edition of an appropriate newspaper of general distribution for two weeks prior to the Auction date as set forth in the Motion.

**IT IS FURTHER ORDERED** that in the event the Debtors receive any inquiries or is aware of any parties that may have an interest in purchasing the Purchased Assets the Debtors shall immediately forward a copy of the Auction Notice to such party. The Debtors may publish the material terms of the Auction Notice using any media source(s) to the extent that, in the exercise of their business judgment, they believe that such publication would facilitate competitive bidding that would realize an increase in the net value of the Purchased Assets.

**IT IS FURTHER ORDERED** that Procedures for Assumption and Assignment of Executory Contracts are approved as follows:

8

## (II)  PROCEDURES FOR ASSUMPTION AND ASSIGNMENT OF EXECUTORY CONTRACTS.

Debtors will provide all Qualified Bidders with a list and a copy of all contracts and leases related to the Purchased Assets, along with proposed cure amounts owing on each contract and lease (the "Cure Schedule"). All Qualified Bidders must provide with their Qualified Bids to Debtors a list of the contracts and leases that it would like Debtors to assume and assign to the Qualified Bidder (the "Assumed Contracts and Assumed Leases") (together, the "Contract Lists").

The following procedures are hereby approved for the assumption and assignment of Assumed Contracts and Assumed Leases ("Assumption and Assignment Procedures").

(a)    On or before April 16, 2019, Debtors shall serve on the counterparties to the contracts on the Contract Lists a notice (the "Assumption and Assignment Notice") in the form attached as **Exhibit C** to the Motion, which is hereby approved, containing the following information:

(i)    Debtors' intent to assume and assign the Assumed Contracts and Assumed Leases to CCI or a Successful Bidder;

(ii)    The Cure Schedule (as supplemented pursuant to the procedure described below);

(iii)    The cure amount Debtors proposed to pay to each counterparty in compliance with the key requirements of Section 365 of the Bankruptcy Code (the "Pre-Petition Cure Amount");

(iv)    That the counterparties to the Assumed Contracts and Assumed Leases shall file and serve any objections to the assumption and assignment of the Assumed Contracts and Assumed Leases or the    Pre-Petition    Cure    Amount    on    or    before    the

9

Assumption/Assignment Objection Deadline, as described below; and

(v) That for each Assumed Contract and Assumed Lease for which an objection is timely received, a hearing will be held at the Sale Hearing, or such other date as the Court may designate, upon twenty-four (24) hours' telephonic, electronic or facsimile notice to the objecting party; provided, however, that if the Assumed Contracts and Assumed Leases that are the subject of objections are assumed and assigned prior to the time of the hearing, the cure amount asserted by the objecting party of such other amount as may be agreed to by the parties or fixed by the Court, will be held in a segregated account by the Successful Bidder or Debtors pending further order of the Court of mutual agreement of the parties.

(b) The counterparties to the Assumed Contracts and Assumed Leases shall file any objections to the assumption and assignment of the Assumed Contracts and Assumed Leases or the Pre-Petition Cure Amount at least three business (3) days prior to the Auction (the "Assumption/Assignment Objection Deadline") and shall serve such objection so that the objection is actually received by: (i) counsel for Debtors' (ii) counsel to CCI, if any; (iii) the Office of the United States Trustee; (iv) counsel for Chemical Bank; (v) counsel for CCI; and (vi) any unsecured creditors committee if one is formed, by the Assumption/Assignment Objection Deadline. Any and all objections must state with detail: the grounds for the objection; if the objecting party proposed an alternative cure amount and the amount thereof; and the basis for the calculation of the proposed alternative amount;

(c) Any party who fails to object by the Assumption/Assignment Objection Deadline shall be forever barred from objecting to the assumption and assignment of its respective executory contract or unexpired lease;

(d) Debtors will make cure payments within thirty (30) days after the date of the closing of the sale of the Purchased Assets and any letters of credit associated with any assumed contract or assumed lease will be replaced by a new letter of credit provided by the Successful Bidder; and

10

(e)    Debtors may file one or more supplemental list or lists of Assumed Contracts and Assumed Leases (the "Supplemental List"), if necessary. Debtors' shall serve to the counterparties to the Assumed Contracts and Assumed Leases on the Supplemental List, a supplemental Assumption and Assignment Notice substantially in the form and containing the information described above. The counterparties with contracts or leases on the Supplemental List shall have five (5) calendar days from service of the Supplemental List to file an objection in accordance with the requirements outlined above and serve upon the parties described above.

The following procedure for rejection of contracts are hereby approved:

(a)    Promptly after both the receipt of the Contract Lists from the Successful Bidder and Closing, Debtors will notify each counter-party to a contract that will be rejected of such rejection (the "Rejection Notice"). Notice shall be effective upon mailing. Objections, if any, to the rejection (and "Rejection Objection") must be filed and served on counsel for Debtors, U.S. Trustee, Chemical Bank within fourteen (14) days after the Rejection Notice was mailed (the "Rejected Contract Deadline");

(b)    Upon receipt of a timely Rejection Objection, Debtors may request that the Bankruptcy Court set a hearing on the Rejection Objection, If the Bankruptcy Court authorizes the rejection, the rejection shall be deemed to have been effective upon the date the sale of the Purchased Assets is closed, unless otherwise determined by the Bankruptcy Court;

(c)    Any party who fails to object by the Rejected Contract Deadline shall be barred from objecting to the rejection of the contract. In such instances, rejections of executory contracts or unexpired leases will be effective upon notice to the party that its contract or unexpired leases has been rejected.

**IT IS FURTHER ORDERED** that Sale Hearing is scheduled for May 3, 2019, at 10 a.m., or as soon thereafter as counsel may be heard before this Court is hereby approved.

## Notice of Auction and Sale Hearing

Within three (3) business days of the entry of this Order, Debtors shall give notice of the Bidding Procedures, and the Auction and Sale Hearing, by serving by electronic mail if available, or by first class mail, a copy of the Auction Notice which is attached to the Motion as **Exhibit C** and is hereby approved, to the following (collectively, the "Notice Parties"):

    (a)    The Office of the United States Trustee;

    (b)    Counsel for Chemical Bank and CCI;

    (c)    All parties to contracts and leases with Debtor;

    (d)    All parties who have requested notice in the case;

    (e)    All interested parties who executed confidentiality agreements in anticipation of a possible bid on the Purchased Assets; and

    (f)    All parties identified on the matrix of the each of the jointly administered cases.

**IT IS FURTHER ORDERED** that any objection to the Sale must be filed and served no later than May 1, 2019, on (i) the Debtors' counsel, (ii) the United States Trustee, (iii) Chemical Bank, (iv) counsel for CCI, (v) counsel for the

Successful Bidder, if not CCI, and (vi) the unsecured creditors committee, if one is formed.

**IT IS FURTHER ORDERED** that the 14-day stay provided for in Fed.R.Bank.P 6004 (h) and 6006 (d) is hereby waived.

**IT IS SO ORDERED.**

# EXHIBIT B

## ASSET PURCHASE AGREEMENT

**THIS ASSET PURCHASE AGREEMENT** (the "Agreement") is made and entered into this 2nd day of April 2019 by and between **K&D Industrial Services Holding Co., Inc.**, a Michigan corporation ("HoldCo"), **K&D Industrial Services, Inc.,** a Michigan corporation ("Industrial Services"), **K&D Industries, Inc.**, a Michigan corporation ("K&D Industries"), **K&D Industrial Services Midwest, Inc.,** an Ohio corporation ("Midwest"), **K&D of Ohio, Inc.,** an Ohio corporation ("K&D Ohio"),(collectively with HoldCo, K&D Industries, Industrial Services, Midwest and K&D Ohio shall be referred to as the "Seller"), having offices at 6470 Beverly Plaza, Romulus, MI ("Seller") and **Cleaning Contractors Inc,** a Michigan corporation having offices at 25600 Brest Road, Taylor MI 48180 ("Purchaser").

## RECITALS

A.      Seller desires to sell to Purchaser, and Purchaser desires to purchase from Seller, the Purchased Assets (as defined below) and assume the Assumed Liabilities (as defined below), upon the terms and conditions hereinafter set forth in this Agreement.

B.      The Parties intend to effectuate the transactions contemplated by this Agreement pursuant to section 363 of the Bankruptcy Code, and the execution and delivery of this Agreement and Seller's ability to consummate the transactions set forth in this Agreement are subject, among other things, to the entry of the Sale Order by the Bankruptcy Court.

**NOW, THEREFORE,** in consideration of the premises and the mutual promises herein made, and in consideration of the representations, warranties and covenants herein contained, the Parties agree as follows:

## WITNESSETH:

1.      <u>SALE AND PURCHASE OF ASSETS.</u> On the terms and subject to the conditions herein expressed, Seller agrees to sell, convey, transfer, assign, set over and deliver to Purchaser on the Closing Date, and Purchaser agrees to purchase and accept, all of the right, title and interest in and to all assets and interests of the Seller in the following (collectively the **"Purchased Assets"**):

(d)      all vehicles and equipment listed on **Exhibit A** including all spare parts, hoses, pumps, tools and accessories related thereto (the "Equipment");

(e)      all warranties or guaranties, if any, applicable to the Purchased Assets, to the extent such warranties or guaranties are assignable in connection with the Purchased Assets (the "Warranties");

(f)      the contracts listed on **Exhibit B** (the "Contracts") provided, however, that any Receivables earned from and/or any work in process associated with any of the assigned Contracts prior to the Closing date shall belong to Seller. Purchaser

shall have the right to exclude any Contract from **Exhibit B** by giving notice to Seller and the counterparty to such contract three (3) business days prior to the Closing.

2.     PURCHASE PRICE.

2.1     Purchaser agrees to pay as the purchase price (the "Purchase Price") for the Purchased Assets the sum of Five Hundred Thousand  and 00/100 Dollars ($500,000.00) (i) sales tax as provided in Section 17 (a) herein, and (ii) assumption of the Assumed Liabilities on the following terms.

(a)     The sum of Fifty-Five Thousand and 00/100 Dollars ($55,000.00) earnest money (the "Deposit"), to be paid by Purchaser to Seller's counsel upon the execution of this Agreement to be held in Seller's counsel's IOLTA account subject to the approval of an order authorizing use of cash collateral order and released to Seller subject to an agreed upon and approved  13-week budget.

(b)     The remaining balance of the Purchase Price, subject to any closing adjustments and pro-rations and after crediting the Deposit, shall be paid in cash or immediately available funds at the Closing.

2.2     Purchaser shall have the right, in its sole discretion, to allocate the Purchase Price for the Purchased Assets for tax purposes and otherwise.

3.     ASSUMPTION OF ASSUMED LIABILITIES.  On the terms and subject to the conditions herein expressed, Purchaser shall assume and thereafter will pay, perform and discharge in accordance with their respective terms, as and when due, only the following (collectively, the **"Assumed Liabilities"):**

(a)     all liability related to taxes ("Taxes") of the Purchased Assets for any period from and after the Closing Date;

4.     TERMINATION

This Agreement may be terminated and the transactions, contemplated hereby may be abandoned at any time prior to the Closing (the effective date of such termination, the **"Termination Date"):**

(a)     by mutual written consent of Purchaser and Seller;

(b)     immediately upon receipt of Notice from Purchaser or the Seller, if (i) any of the conditions in Sections 11, 12.1 or 18 (if Purchaser is the terminating Party), (ii) Section 12.2 or 18(a) (if the Seller is the terminating Party) have not been satisfied by the Outside Date, or (iii) satisfaction of any such conditions is or becomes impossible, in each case other than through the failure of the terminating Party to comply with such Party's obligations under this Agreement by such date;

(c)     by Purchaser if there shall be a material breach by the Seller of any representation or warranty or any covenant or agreement contained in this Agreement, and which

breach cannot be cured or has not been cured by 10 Business Days after the giving of written Notice of such breach;

(d)     by Purchaser or the Seller, if (i) Purchaser is not approved as the purchaser of the Purchased Assets or (ii) any person or entity (other than Purchaser) is selected and approved by the Bankruptcy Court at the sale hearing as the purchaser of the Purchased Assets or any part thereof; Upon any termination, the Party effecting such termination shall deliver Notice thereof to the other Party as promptly as practicable.

5.     <u>DEPOSIT</u>.  If the Closing is completed in accordance with the terms of this Agreement, Seller shall apply the Deposit to the balance of the Purchase Price at Closing. If Purchaser defaults under this Agreement, beyond any applicable notice and/or grace period, and fails or refuses to close the sale as provided in this Agreement, then Seller may retain the Deposit as liquidated damages for Purchaser's failure to close this sale in accordance with the terms of this Agreement.  If the purchase and sale of Purchased Assets fails to close for any other reason, including if Seller defaults under this Agreement beyond any applicable notice and/or grace <u>period</u>, or fails or refuses to close the sale as provided in this Agreement, or if this Agreement is terminated pursuant to Sections 4(a), (b), (c) or (d), then the Deposit shall be returned to Purchaser within 5 business days.

6.     <u>BROKERS' FEES</u>.  Each Party warrants that it has not dealt with any broker or other person in connection with the sale of the Purchased Assets in any manner that could give rise to a claim for commission or similar fee.   Each Party agrees to indemnify and hold the other harmless against and from all claims for real estate or other commissions and other fees with respect to the procurement and closing of this Agreement made by any person with whom they have dealt other than as provided herein.

7.     <u>CLOSING</u>.  The date for closing the sale and purchase of the Purchased Assets (the "Closing") shall be the third business day after the Closing Conditions set for below have been satisfied or waived ("Closing Date").  The Closing shall be held at the offices of Seller's attorney and may be done by mail in escrow or at such other time, date or place as the Parties may mutually agree.  At the Closing the parties will execute and deliver such affidavits and other closing documents reasonably necessary to transfer title to the Purchased Assets in accordance with this Agreement.

8.     <u>CONVEYANCE OF PURCHASED ASSETS</u>.

8.1     At the Closing, Seller shall execute and deliver the following to Purchaser:

(a)     A bill of sale, executed by Seller, so as to convey to Purchaser all right, title and interest of Seller in and to the Equipment, free and clear of all liens, claims and encumbrances (the "Bill of Sale").

(b)     Assignments of the Contracts and Warranties if any.

(c) Any other documents explicitly required by this Agreement to be delivered by Seller, including but not limited to all vehicle titles related to the Equipment.

9. "AS IS WHERE IS". Purchaser takes the Purchased Assets in their present condition, "AS IS WHERE IS," without reliance upon any representation, warranty, opinion or statement of Seller, or any agent of Seller, not contained in this Agreement and, further, Purchaser affirmatively represents that neither Seller nor anyone on behalf of Seller has expressly or impliedly made or given any such representation, warranty, opinion or statement to Purchaser or anyone on Purchaser's behalf not specifically provided in this Agreement. Purchaser acknowledges that this Section is a material part of the consideration to be received by Seller under this Agreement, and that Seller has agreed to the Purchase Price by reason of such understanding. This representation by Purchaser shall survive Closing.

10. REPRESENTATIONS AND WARRANTIES OF SELLER.

10.1 Environmental Matters.

(a) Seller has obtained all Permits required under all applicable Environmental Laws necessary to operate the Purchased Assets.

(b) The Seller has not received any written communication alleging that the Seller may be in violation of any Environmental Law or any Permit issued pursuant to Environmental Law, or may have any Environmental Liabilities or Obligations, and to the best of Seller's knowledge there is no basis for any of the same.

10.2 Other. Notwithstanding anything contained to the contrary herein, Seller represents as follows:

(a) There is no action, proceeding or investigation pending or, to the best of Seller's knowledge and belief, contemplated or threatened by or against Seller which would affect the Seller's ability to sell the Purchased Assets as provided in this Agreement. There are no bankruptcy proceedings pending, contemplated or threatened by or against Seller, except for the Bankruptcy Case to be filed and reflected at Section 11.1 herein.

(b) No person or entity has any right, option or right of first refusal to purchase the Purchased Assets.

(c) Seller is a Michigan corporation duly formed and in good standing under the laws of the State of Michigan and has the requisite power and authority to enter into and to perform the terms of this Agreement. The execution and delivery of this Agreement and the consummation of the transactions contemplated hereby have been duly authorized by all requisite action of Seller. Seller is not subject to any law, order, decree, restriction or agreement which prohibits or would be violated by this

4

Agreement or the consummation of the transactions contemplated hereby. Seller has taken all necessary action to authorize the execution, delivery and performance of this contract and has the power and authority to execute, deliver and perform this contract and consummate the transaction contemplated hereby. Subject to approval of this Agreement by the Bankruptcy Court (as hereinafter defined) and entry of the Sale Order, this contract and all obligations of Seller hereunder are the legal, valid and binding obligations of Seller, enforceable in accordance with the terms of this contract.

(d)     Neither the execution nor delivery of this Agreement, nor the closing of the transaction contemplated hereby, violate any order or decree of any court, or any agreement to which the Seller is a party or to which any of the assets of Seller are subject.

(e)     Until the Closing or earlier termination of this Agreement, Seller shall maintain the Purchased Assets in a manner consistent with the manner in which Seller has maintained the Purchased Assets prior to the date hereof.

(f)     Between the Effective Date and the earlier of the Closing Date or the Termination Date, the Seller shall keep in effect all policies of insurance currently maintained by the Seller to insure the Purchased Assets (collectively, the "Insurance Policies"). To the extent that the Insurance Policies insure against any loss, liability, claim, damage or expense resulting from, arising out of, based on or relating to occurrences arising on or after the Effective Date and prior to the Closing with respect to the Purchased Assets and permit claims to be made thereunder with respect to such losses, liabilities, claims, damages or expenses after the Closing, and Purchaser elects to proceed with the Closing pursuant to Section 7 herein, Seller shall to the extent Seller is permitted to do so by the United States Trustee's Office, use its commercially reasonable efforts to obtain an insurance certificate naming Purchaser as an additional insured under the Insurance Policies.

(g)     The Seller has possession, custody and control over the Purchased Assets and, subject to further order of the Bankruptcy Court, the right to sell the Purchased Assets.

(h)     There are no material claims pending or threatened against the Seller with respect to the Purchased Assets or any of the Purchased Assets at law or in equity, or before or by any federal, state, municipal, or other governmental unit, commission, board, bureau, agency, or instrumentality, domestic or foreign involving an amount in excess of $10,000 or seeking injunctive relief.

(i)     **Exhibit C** contains a true and complete list of all Insurance Policies in

force with respect to the Purchased Assets. True and complete copies of such Insurance Policies have been made available to Purchaser.

(j)      Except as set forth on **Exhibit D**, all Taxes imposed on the Purchased Assets required to have been paid by the Seller have been paid. There are no liens for Taxes (other than for Taxes not yet due and payable or being contested in good faith by appropriate proceedings, which contested Taxes are set forth on Exhibit D) upon any of the Purchased Assets.

(k)      Between the Effective Date and the earlier of the Closing Date or the Termination Date, the Seller shall have adequate funding to maintain ordinary course of business operations and shall have obtained all necessary Bankruptcy Court approvals for the use of cash collateral and the incurrence of post-petition debt (if required by the Seller to maintain ordinary course of business operations ("DIP Funding"). In the event that DIP Funding is required, as a condition to the incurrence of such indebtedness the Seller shall require the DIP lender to acknowledge and agree to the terms of this Agreement, including but not limited to with respect to the Breakup Fee and related terms.

(l)      Labor and Employment Matters. No controversies, disputes or proceedings are pending or, to the Seller's knowledge, threatened against Seller with respect to the employees of the Seller. To the Seller's knowledge, no employee of the Seller has indicated to Seller his or her intention to terminate his or her respective employment with the Seller or not to accept employment with Purchaser immediately after the Closing. Other than as set forth on **Exhibit E**, Seller is not a party to any collective bargaining agreement, union contract or similar agreement (any union identified on Exhibit E, a "Union"). There is no (a) unfair labor practice complaint pending against Seller or, to the Seller's knowledge, threatened in writing against any Seller and (b) no strike, labor dispute, slowdown or stoppage is pending or, to the Seller's knowledge, threatened against the Seller.

11.   <u>BANKRUPTCY CONDITIONS.</u>

11.1    Seller filed a Chapter 11 petition (the "Bankruptcy Case") in the Eastern District of Michigan (the "Bankruptcy Court") on March 18, 2019 ., Seller shall have duly filed with the Bankruptcy Court and served in accordance with Rules 2002 and 6004 of the Federal Rules of Bankruptcy Procedure, and a motion to expedite the hearing, on or before April 3, 2019 (i) a motion (the "Procedures Motion"), in form and substance reasonably satisfactory to the Purchaser, seeking an order approving this Agreement (subject to higher or better offers submitted by a bid deadline acceptable to the Purchaser) (the "Bid Deadline"), the Overbid Procedures and the Break Up Fee detailed in Section 11.2 (the "Procedures Order"), in form and substance reasonably satisfactory to the Purchaser, which Procedures Order shall have (A) been entered by the Bankruptcy Court and (B) become a Final Order; and (ii) a motion (the "Sale

Motion"), in form and substance reasonably satisfactory to the Purchaser, seeking an order approving the consummation of the transactions contemplated by this Agreement (the "Sale Order"), in form and substance reasonably satisfactory to the Purchaser. Seller shall use its best efforts to ensure the Bankruptcy Court enters the Procedures Order by April 16, 2019 and the Sale Order by May 3, 2019.

11.2    <u>Overbid Procedures and Break-up Fee.</u>

(a)    Seller and Purchaser agree that overbidding procedures and break-up fee payments shall be governed by this Section 11.2 and included in the Procedures Order. No competing bid for the Purchased Assets will be accepted or approved by the Seller unless it is made prior to the Bid Deadline, accompanied by a Fifty-Five Thousand and 00/100 Dollars ($55,000.00) deposit received by the Escrow Agent via wire or certified check, and pursuant to terms at least as favorable to Seller as those contained in this Agreement and provide an aggregate consideration having a value equal to at least the sum of (A) the Purchase Price, plus (B) the Break-up Fee (as hereinafter defined), plus (C) Twenty-Five Thousand and 00/100 Dollars ($25,000.00) (collectively, the "Initial Overbid"). All competing bids must be made in the form of this Agreement, executed, and be accompanied by a red-line copy of the Agreement showing any changes to the form of this Agreement. Following the Initial Overbid, the subsequent bid increments shall be Thirty-Five Thousand and 00/100 Dollars ($35,000.00). If a competing bid is approved by order of the Bankruptcy Court, the Purchaser shall be paid a break-up fee of Thirty Thousand and 00/100 Dollars ($30,000.00) (the "Break-Up Fee"), and the Deposit shall be returned to Purchaser, within two (2) business days. In any event, if the Purchaser is not the successful bidder, the Deposit shall be returned to the Purchase within ten (10) business days from the date of the Closing. The Break-Up Fee shall be paid to Purchaser upon the earlier of (i) closing of any such competing bid; the occurrence of an Event of Default; or (iii) three (3) business days after the Sale Motion is withdrawn or denied. The Break-Up Fee shall be (a) treated as a superpriority administrative expense claim under §§ 503(b)(1)(A) and 507(a)(1) of the Bankruptcy Code with priority in payment over any and all administrative expenses of the kinds specified or ordered pursuant to any provision of the Bankruptcy Code, including, but not limited to, Bankruptcy Code §§ 105, 326, 328, 330, 331, 503(b), 506(c), 507(a), 507(b), 726, 1113 and 1114, and (b) shall be paid ahead of Chemical Bank in the event of the closing of an alternative transaction by the Seller.

11.3    <u>Sale Order.</u>

(a)    The Sale Order shall be reasonably satisfactory to Purchaser and among other things, shall:

(i)     approve the terms and conditions of this Agreement and the sale of the Purchased Assets to Purchaser;

(ii)    authorize the Seller to enter into the transactions contemplated by this Agreement;

(iii)   provide that Purchaser shall have no obligations to cure any pre-closing defaults by Seller relating to the Purchased Assets and that the exclusive remedy available to any party asserting any such pre-closing default shall be to pursue a claim against the Seller in the Bankruptcy Court;

(iv)    authorize the sale of the Purchased Assets to Purchaser pursuant to this Agreement and § 363(b) and (f) of the Bankruptcy Code, free and clear of all liens, claims and encumbrances against or other "interests" in the Purchased Assets within the meaning of § 363(f) of the Bankruptcy Code and otherwise free and clear of all other claims, encumbrances, liabilities and interests and also free and clear of claims for successor liability with all liens, claims and encumbrances transferred to the proceeds on the rank and priority existing as of the date Seller files the Bankruptcy Case (the "Petition Date");

(v)     provide that the order is effective as a termination of any lien, claim, encumbrance, liability or interest in or on the Purchased Assets and that no further filings are necessary to give effect to Section 11.3(iv) above; and, notwithstanding the fact that no such filings will be necessary as a result of the foregoing, authorize the parties in interest to file any termination statements required to terminate of record any liens on the Purchased Assets;

(vi)    provide that appropriate notice of sale of the Purchased Assets "free and clear" has been provided to all persons and entities holding existing claims, causes of action, claims, interests or liens of any kind;

(vii)   authorize Seller to consummate the transactions contemplated by this Agreement;

(viii)  determine Purchaser is a good faith purchaser and is entitled to the protections of Section 363(m) of the Bankruptcy Code; and

(ix)     determine that the transactions contemplated by this Agreement are exempt from all State, City and County mortgage, transfer, stamp or other similar taxes pursuant to 11 U.S.C. § 1146(c).

11.4     Final Order:  "Final Order" means an order as to which the time to appeal, petition for certiorari, or move for reargument or rehearing has expired and as to which no appeal, petition for certiorari, or other proceedings for reargument or rehearing shall then be pending or as to which any right to appeal, move for a stay pending appeal, petition for certiorari, reargue, or rehearing shall have been waived in writing in form and substance satisfactory to the Purchaser or, in the event that an appeal, writ of certiorari, or reargument or rehearing thereof has been sought, such order shall have been denied by the highest court to which such order was appealed, or certiorari, reargument or rehearing shall have been taken and the time to take any further appeal, petition for certiorari or move for reargument or rehearing shall have expired.

11.5     Rejected Contracts.  Within 10 days of the Petition Date, Seller shall provide a written proposal to the Union satisfying the requirements of section 1113(b)(1)(A) of the Bankruptcy Code and thereafter shall comply with the obligations under section 1113(b)(1)(B) and (b)(2) of the Bankruptcy Code.

12.     CLOSING CONDITIONS.

12.1     Conditions to Obligations of Purchaser. The obligation of Purchaser to consummate the Closing is subject to the satisfaction (or waiver by Purchaser) of the following further conditions:

(a)     Seller shall have timely filed the Bankruptcy Case and the Bankruptcy Court shall have timely entered the Sale Order in the Bankruptcy Case, in form and substance reasonably acceptable to Purchaser (including but not limited to a finding that Purchaser is a "good faith" purchaser within the meaning of Section 363(m) of the Bankruptcy Code and waiving any stay that would otherwise be applicable pursuant to Bankruptcy Rules 6004(h));

(b)     Seller shall have timely performed in all material respects all of its obligations hereunder required to be performed by Seller on or prior to the Closing Date;

(c)     the representations and warranties of Seller contained in this Agreement shall be true and correct in all material respects at and as of the Closing Date, as if made at and as of such date (or to the extent such representations and warranties speak as of an earlier date, they shall be true and correct as of such earlier date);

(d)     The Procedures Order shall have been filed on or before April 16, 2019, the Sale Order shall have been entered on or before May 3, 2019, and the Closing shall have occurred on or before May 7, 2019 (the "Outside Date");

(e)     Seller shall convey good and marketable title to the Purchased Assets, free and clear of all liens, claims, encumbrances and interests; and

(j)     The owner/landlord of the location of Seller's current operations at 270 9th Avenue, Mansfield, Ohio, shall have agreed to lease such location to Purchaser for a period of at least six (6) months at rental rates and on lease terms acceptable to Purchaser.

12.2     <u>Conditions to Obligations of Seller</u>.     The obligation of Seller to consummate the Closing is subject to the satisfaction (or waiver by Seller) of the following further conditions:

(a)     The Bankruptcy Court shall have entered the Sale Order in the Bankruptcy Case in form and substance acceptable to Seller and Purchaser (including a provision waiving any stay that would otherwise be applicable pursuant to Bankruptcy Rule 6004(h)).

(b)     Purchaser shall have performed in all material respects all of its obligations hereunder required to be performed by it on or prior to the Closing Date; and

(c)     the representations and warranties of Purchaser contained in this Agreement shall be true and correct in all material respects at and as of the Closing Date, as if made at and as of such date (or to the extent such representations and warranties speak as of an earlier date, they shall be true and correct in all material respects as of such earlier date).

12.3     <u>Events of Default.</u> The occurrence of any of the following shall, at the option of Purchaser, constitute an Event of Default with respect to this Agreement:

(a)     any representation or warranty of Seller made herein or in any other document related hereto or in any other writing given to Purchaser in connection with the sale of the Purchased Assets shall have been misleading or incorrect in any material respect as of the time when the same shall have been made;

(b)     any default in the performance or observance of any term, covenant or agreement to be performed by Seller in this Agreement or any document related hereto;

(c)     the sale, exchange, conveyance, assignment, transfer or other disposition or divestiture of Seller's title to any of the Purchased Assets, or other conveyance of a security interest in, or other encumbrance on any of the Purchased Assets or any interest therein, whether voluntary or involuntary, without Purchaser's prior written consent;

(d)     any merger, consolidation or sale of Seller or transfer of any portion of the Purchased Assets of the Seller without Purchaser's written consent;

(e)     the sale, exchange, transfer, assignment, encumbrance or disposition of any of the

10

membership interests or other ownership interest of the Seller;

(f)    if an order shall be entered by the Bankruptcy Court appointing, or the Seller shall file an application for an order seeking the appointment of, (i) a trustee under Section 1104 of the Bankruptcy Code, or (ii) an examiner with enlarged powers relating to the operation of the business (powers beyond those set forth in Section 1106(a)(3) and (4) of the Bankruptcy Code) under Section 1106(b) of the Bankruptcy Code;

(g)    if an order shall be entered by the Bankruptcy Court converting the Seller's chapter 11 case to a chapter 7 case;

(h)    if an order shall be entered by the Bankruptcy Court confirming a plan of reorganization in the Bankruptcy Case which does not (i) contain a provision for payment in full in cash of all obligations hereunder on or before the effective date of such plan or plans upon entry thereof, and (ii) provide for the continuation of the liens and security interests granted to the Purchaser and priorities until such plan effective date;

(i)    if an order shall be entered by the Bankruptcy Court dismissing the Bankruptcy Case which does not contain a provision for payment in full in cash of all obligations hereunder upon entry thereof;

(j)    if an order shall be entered by the Bankruptcy Court without the express prior written consent of the Purchaser, (i) to revoke, reverse, stay, modify, supplement or amend the Procedures Order or (ii) to permit any administrative expense or any claim (now existing or hereafter arising, of any kind or nature whatsoever) to have administrative priority as to the Purchaser equal or superior to the priority of the Purchaser, or (iii) to grant or permit the grant of a lien on the Purchased Assets;

(k)    if an order shall be entered by the Bankruptcy Court that is not stayed pending appeal granting relief from the automatic stay to any creditor against any of the Purchased Assets; or

(l)    the termination of this Agreement for any reason including, without limitation, pursuant to Sections 4, 12.1 or 18.

12.4    <u>Remedies.</u> Upon the occurrence of an Event of Default, that the Seller has failed to cure within two business days after written notice from Purchaser, then in addition to any remedies available to Purchaser under applicable law and as otherwise provided for in this Agreement, Purchaser may take one or more of the following remedial steps in any order of priority:

(a)    Request a hearing to seek authorization to commencement enforcement proceedings, subject to the rights of the Senior Secured Creditors except as otherwise set forth in this Agreement.

No remedy conferred in this Agreement or the other documents related hereto is intended to be exclusive of any other remedy, and each and every such remedy shall be cumulative and shall be in addition to every other remedy conferred herein or now or hereafter existing at law or equity or by statute or otherwise.

13. <u>NOTICES</u>. Except as otherwise provided in this Agreement, all notices, demands, requests, consents, approvals or other communications (for the purposes of this Section collectively referred to as "<u>Notices</u>") required or permitted to be given hereunder or which are given with respect to this Agreement, in order to constitute effective notice to the other party, shall be in writing and shall be deemed to have been given when (a) personally delivered with signed delivery receipt obtained, (b) when transmitted by facsimile machine, if followed by the giving of, pursuant to one of the other means set forth in this Section 13 before the end of the first Business Day thereafter, printed confirmation of successful transmission to the appropriate facsimile number of the addressee listed below as obtained by the sender from the sender's facsimile machine, (c) upon receipt, when sent by prepaid reputable overnight courier or (d) three (3) days after the date so mailed, if sent by certified mail, return receipt requested, postage prepaid, in all cases addressed to the party to be notified at its address set forth below or to such other address as such party shall have specified most recently by like Notice, as follows:

Seller, to:        K & D Industrial Services, Inc.
c/o Lynn Brimer, Esq.
Strobl & Sharp, P.C.
300 E. Long Lake Rd., Ste. 200
Bloomfield Hills, MI 48304
P: (248) 205-2772
F: (248) 645-2690
lbrimer@stroblpc.com

Purchaser, to:  Cleaning Contractors Inc.

c/o Allen Longsdorf, COO
25600 Brest Road
Taylor, MI 48180
P: (734) 946-4270
F: (734) 946-4372

14. <u>DUE DILIGENCE PERIOD</u>. Purchaser shall have until April 17, 2019(the "<u>Due Diligence Period</u>") within which to perform any studies or inspections it deems necessary or desirable on the Purchased Assets, and to terminate this Agreement within the Due Diligence Period if any conditions are deemed unsatisfactory to Purchaser in its absolute and sole discretion. During the Due Diligence Period, Seller will also give Purchaser access to any and all records in Seller's possession or under Seller's control which concern the physical condition of the Purchased Assets, and any other information Seller actually has in its possession or control concerning the condition of the Purchased Assets. If Purchaser does not terminate this Agreement by giving written notice of such termination to Seller within the Due Diligence Period, then Purchaser shall be deemed to have accepted the Purchased Assets "AS IS WHERE IS," without reliance upon any representation, warranty, opinion or statement of Seller, or any

agent of Seller, not contained in this Agreement and, further, Purchaser affirmatively represents that neither Seller nor anyone on behalf of Seller has expressly or impliedly made or given any such representation, warranty, opinion or statement to Purchaser or anyone on Purchaser's behalf not specifically provided in this Agreement. Purchaser acknowledges that this Section is a material part of the consideration to be received by Seller under this Agreement, and that Seller has agreed to the Purchase Price by reason of such understanding. This representation by Purchaser shall survive Closing.

15. <u>BENEFIT</u>. This Agreement shall be binding upon and inure to the benefit of Seller and Purchaser and their respective successors and assigns.

16. <u>ENTIRE AGREEMENT; AMENDMENTS; COUNTERPARTS</u>. This Agreement (including the Schedules and Exhibits thereto) set forth the entire agreement among the Parties with respect to the subject matter hereof and may be amended only by a writing executed by Purchaser and Seller. This Agreement may be executed in counterparts, each of which when taken together shall constitute an original. This Agreement may be executed by facsimile, and such facsimile signature shall be treated as an original hereunder. This Agreement shall become effective when each Party hereto shall have received a counterpart hereof signed by the other Party hereto.

17. <u>TIME OF THE ESSENCE</u>. Time shall be of the essence with respect to the performance by the Parties of their respective obligations hereunder.

18. <u>EXPENSES</u>. Except as otherwise provided herein, the parties shall be liable for expenses as follows:

    (a)    Sales Tax. Purchaser shall be responsible for and shall pay any sales tax due as a result of the transfer of any personal property in connection herewith and shall remit the same to Seller with the Purchase Price if such tax is required to be collected by Seller under applicable law, with all such sums to be added to the Purchase Price.

    (b)    Purchaser will be responsible for and shall pay the Pre-Closing Taxes, which shall be added to the Purchase Price.

    (c)    Other Fees and Expenses. As to all other customary closing costs and expenses, each party shall pay its respective expenses, taxes, charges and liabilities incurred in connection with or arising out of the exercise of their respective rights or obligations under this Agreement and the transfer of title from Seller to Purchaser.

19. <u>DESTRUCTION OF PROPERTY</u>. Upon acceptance of this Agreement by Seller, the risk of loss or damage to the Purchased Assets shall be borne by the Seller until Closing, during which time Seller shall continue to insure the Purchased Assets against loss, damage or destruction by fire with extended coverage endorsement. In the event of such loss, damage or destruction occurring prior to Closing, the parties shall have the following options:

13

(a) If the damage to the Purchased Assets, as determined by the adjuster, exceeds 25% of the Purchase Price, then either party may elect to rescind this Agreement by giving the other party written notice of such election within twenty (20) days after the occurrence of such damage, loss or destruction, or the date of Closing, whichever is sooner, whereupon the Deposit shall be refunded to Purchaser and the parties shall have no further rights or obligations hereunder; or

(b) At Purchaser's sole option, the parties shall proceed with Closing of the Purchased Assets in which event either (i) Purchaser shall receive a credit against the Purchase Price equal to the loss or damage sustained by the Purchased Assets, as determined by the insurance adjuster for Seller's carrier; or (ii) Seller shall assign to Purchaser all of Seller's rights in and to the insurance recovery due by reason of such loss or damage to the Purchased Assets, with no reduction in the Purchase Price.

20. <u>ASSIGNMENT</u>. Purchaser shall have the absolute right to assign this Agreement to an affiliate. Purchaser may assign, mortgage or sell this Agreement or its rights hereunder to an entity which is not an affiliate, by providing Seller not less than five (5) Business Days' prior written notice of such assignment prior to the date of Closing, provided the Purchase Price and all terms hereunder are unaffected by such assignment.

21. <u>DEFAULT; REMEDIES</u>.

20.1 If Seller has performed or is ready, willing and able to perform all obligations required by this Agreement and Purchaser shall fail or refuse to perform this Agreement within the time and in the manner provided, then Seller may elect to terminate this Agreement by giving written notice thereof to Purchaser, and upon giving such notice, Seller's sole and exclusive remedy shall be to receive the Deposit as liquidated damages, the Parties recognizing that Seller's actual damages in the event of Purchaser's default will be difficult to ascertain.

20.2 Purchaser, in addition to all other remedies set forth in this Agreement, may seek specific performance of this Agreement in the event of default by the Seller.

22. <u>CAPTIONS, HEADINGS, INTERPRETATION</u>. The captions herein are included for convenience of reference only and shall be ignored in the construction or interpretation hereof. The headings contained in this Agreement are for convenience of reference only and shall not affect the meaning or interpretation of this Agreement. Whenever the words "include," "includes" or "including" are used in this Agreement, they shall be deemed to be followed by the words "without limitation." In the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by the Parties and no presumption or burden of proof shall arise favoring or disfavoring any Party by virtue of authorship of any provisions of this Agreement.

23. <u>AMENDMENT AND MODIFICATION</u>. This Agreement may only be amended, modified or supplemented by an agreement in writing signed by each party hereto.

14

24.     <u>WAIVER</u>.     No waiver by any party of any of the provisions hereof shall be effective unless explicitly set forth in writing and signed by the party so waiving. No waiver by any party shall operate or be construed as a waiver in respect of any failure, breach or default not expressly identified by such written waiver, whether of a similar or different character, and whether occurring before or after that waiver. No failure to exercise, or delay in exercising, any right, remedy, power or privilege arising from this Agreement shall operate or be construed as a waiver thereof; nor shall any single or partial exercise of any right, remedy, power or privilege hereunder preclude any other or further exercise thereof or the exercise of any other right, remedy, power or privilege.

25.     <u>GOVERNING LAW</u>.     This Agreement shall be governed by and construed in accordance with the internal laws of the State of Michigan and any applicable provisions of the Bankruptcy Code, without regard to the principles of conflicts of law that would provide for application of another law.

26.     <u>EFFECTIVE DATE</u>.     As used herein, the term "Effective Date" shall mean the last date of signature by the parties hereto.


*[Signature page and Exhibits follow.]*

15

IN WITNESS WHEREOF, the Parties hereto have executed this Agreement as of the date first written above, in multiple counterparts, each of which shall be deemed an original and all of which shall evidence but one agreement.

**K & D INDUSTRIAL SERVICES HOLDING CO., INC.,**
a Michigan corporation

By:_____

Title:_____

**CLEANING CONTRACTORS, INC.,**
a Michigan corporation

By:_____

Title:_____

**K & D INDUSTRIAL SERVICES, INC.,**
a Michigan corporation

By:_____

Title:_____

**K & D INDUSTRIES, INC.,**
a Michigan corporation

By:_____

Title:_____

**K & D INDUSTRIAL SERVICES MIDWEST, INC.,**
an Ohio corporation

By:_____

Title:_____

16

**K & D OF OHIO, INC.,**
an Ohio corporation

By:_____

Title:_____

{S&B/12121/002/FORM/SB673202.DOCX}

# EXHIBIT A
## (Asset List – Section 1(a))

| K&D ID | YEAR | MAKE | DESCRIPTION | | K&D OWNED | K&D TITLED |
|--------|------|------|-------------|---|-----------|------------|
| DS5 | 1990 | Ford | Dust Sprayer | 1FDPF82K0LVA16499 | K&D of Ohio | K&D of Ohio |
| DS6 | 1991 | Ford | Dust Sprayer | 1FDPK84P5MVA19033 | K&D Midwest | K&D Industrial Services Midwest Inc. |
| DT 010 | 2001 | Sterling | Dump Truck | 2FZHAZAS01AH49638 | K&D Industries | K&D Industrial |
| DTR 010 | 1997 | Easton | Dump Trailer | 1E1D2S381VRE22585 | K&D of Ohio | K & D of Ohio, Inc. |
| DTR 011 | 1998 | Benson | Dump Trailer | 1NUDT38N0WMAA0466 | K&D of Ohio | K & D of Ohio, Inc. |
| DTR 012 | 1998 | Benson | Dump Trailer | 1NUDT38N5WMAA0463 | K&D of Ohio | K & D of Ohio, Inc. |
| ER 019 | 1995 | US | Trailer | 4PL500M2XS1001010 | K&D Industrial Services | K&D Industrial Services Inc |
| ER 020 | 1980 | Chevy | Truck Light | CPM35A3300854 | K&D of Ohio | K & D of Ohio, Inc. |
| HVP002 | 1996 | Chev | HP Vacuum Pump EH | 1G8M7H1J0T101951 | K&D Industrial Services | K&D Industries of Ohio Inc |
| JC 027 | 1999 | GMC | Jet Cleaner | 1GDP7H1C5XJ515237 | K&D of Ohio | K&D of Ohio Inc |
| MS 004 | 2003 | Sterling | Mobile Sweeper | 49HAADBVX371504 | K&D Midwest | K&D Industrial Services Midwest Inc. |
| MS 005 | 2009 | Freightliner | Mobile Sweeper | 1FVACXDTX9HAK3333 | K&D Midwest | K&D Industrial Services Midwest Inc. |
| P 141 | 2006 | GMC | Pick up Truck | 1GTHC23U36F268809 | K&D of Ohio | K & D of Ohio, Inc. |
| P 154 | 2006 | Ford | Pick up Truck | 1FDSF34576ED16730 | K&D Industries | K&D Industries Inc. |
| RT 006 | 2002 | Freightliner | Roll Off Truck | 1FVHBGA892HK07411 | K&D of Ohio | K&D Industries of Ohio Inc |
| RTR011 | 1996 | Benlee | Roll Off Trailer | 1B9A14037T8183142 | K&D of Ohio | K & D of Ohio, Inc. |
| S 027 | 1993 | Ford | Stake Truck | 1FDNK74C1PVA15237 | K&D of Ohio | K & D of Ohio, Inc. |
| S 029 | 2002 | Chevy | Stake Truck | 1GBJC33UX2F120596 | K&D Midwest | K&D Industrial Midwest Services Inc |
| S 030 | 2000 | Chevy | Stake Truck | 1GBHC33F0YF485510 | K&D of Ohio | K & D of Ohio, Inc. |
| SNO003 | 2007 | Chevrolet | Snow Truck | 1GCHK23K97F513793 | K&D of Ohio | K & D of Ohio, Inc. |
| T 062 | 2000 | Freightliner | Tractor | 1FUPDXYB0YLB35017 | K&D Industries | K&D Industries Inc. |
| T 068 | 2003 | Freightliner | Tractor | 1FUJA6AS13LK40254 | K&D of Ohio | K&D Industrial Cleaning of Ohio Inc. |
| T 070 | 2006 | Freightliner | Tractor | 1FUJA6CK26LV98626 | K&D of Ohio | K&D Industrial Cleaning of Ohio Inc. |
| TR 015 | 1981 | Assembled | Trailer | 31210U | K&D Industries | |
| TR 026 | 1997 | Moritz | Trailer | 4WXFF2024V1001671 | K&D of Ohio | |
| TR 034 | 2001 | Chevy Better | Trailer | 4MNFB202711002077 | K&D Midwest | K&D Industrial Services Midwest Inc. |
| TR 036 | 1997 | HMD | Trailer | 2061102100 | K&D of Ohio | |

| | | | | | | |
|---|---|---|---|---|---|---|
| VP 035 | 1992 | Ford | Vacuum Pumper | 1FDYW90L9NVA17921 | K&D Industrial Services | K&D Industrial Services of Ohio |
| VP 039 | 2001 | International | Vacuum Pumper | 1HTSHADT51H387789 | K&D Midwest | K&D Mid-West, Inc |
| VTT016 | 1986 | Presvac | Vacuum Tanker Trailer | 2P9S65381G1005038 | K&D Industrial Services | K & D Industrial Services Inc. |
| WT 002 | 1997 | Ford | Water Truck | 1FDYU90L1VVA18051 | K&D Midwest | K&D Industrial Services Midwest Inc. |
| WT 004 | 2002 | Sterling | Water Truck | 1FWBATBS92AJ39945 | K&D Midwest | K&D Industrial Services Midwest Inc. |
| RVB1 | | | Roll Off Vacuum Boxes | | K&D Industrial Services | |
| RVB2 | | | Roll Off Vacuum Boxes | | K&D Industrial Services | |
| RVB6 | | | Roll Off Vacuum Boxes | | K&D of Ohio | |
| RVB7 | | | Roll Off Vacuum Boxes | | K&D of Ohio | |
| RVB8 | | | Roll Off Vacuum Boxes | | K&D Industrial Services | |
| WB 9 | | | Water Blaster | | K&D of Ohio | |
| RB 63 | | | Roll Off Box | | K&D Industries | |
| RB 82 | | | Roll Off Box | | K&D Industrial Services | |
| RB 85 | | | Roll Off Box | | K&D Industrial Services | |
| RB 89 | | | Roll Off Box | | K&D of Ohio | |
| RB 98 | | | Roll Off Box | | K&D Industrial Services | |
| RB102 | | | Roll Off Box | | K&D Industrial Services | |
| RB 109 | | | Roll Off Box | | K&D Industrial Services | |
| RB 126 | | | Roll Off Box | | K&D Industrial Services | |
| RB 139 | | | Roll Off Box | | K&D Industries | |
| RB 151 | | | Roll Off Box | | K&D Industrial Services | |
| RB 152 | | | Roll Off Box | | K&D Industrial Services | |
| RB 154 | | | Roll Off Box | | K&D Industrial Services | |
| RB 162 | | | Roll Off Box | | K&D Industrial Services | |
| RB 173 | | | Roll Off Box | | K&D Industrial Services | |
| RB 182 | | | Roll Off Box | | K&D Industrial Services | |
| RB 217 | | | Roll Off Box | | K&D of Ohio | |
| DC 1 | | | Drum Crusher | | K&D Industries | |
| Shop Equipment | | | | | K&D of Ohio | |
| All Winch Machines and EQMT | | | | | | |
| Connex Office for AK Baghouse | | | | | | |
| AK | | | | | | |

Trailer

Arcelormittal Trailer

2 Connex Boxes  40 ft.

P-156 2012 Ford F-350 Crewcab Vin# 1FT8W3B64CEA45664

S-36 2006 Ford F-350 Utility Stake 1FDSF34576EC92428

Cold Jet Model 2AO148 - G2, Dry Ice Blaster

Two no identifying name 48' tandem axle storage
Trailers

Miller Model Millermatic 200, welder S/n KB899500

Acetylene Torch

Lincoln Model SP-100 Arc welder S/n U1940320570

Parts Washer

K&D Midland

K&D Industrial
Services

K&D of Ohio

20

**EXHIBIT B**

**(Contracts – Section 1(c))**

| Contacting Party | Date | Nature of Contract | K&D Contracting Entity |
|---|---|---|---|
| AK Steel | 2/2/2011 | Waste Handling Agreement | K&D Ohio |
| | 12/28/2018 | Blanket PO for Waste Transportation | K&D Ohio |
| | 1/22/2019 | PO – Magnet to pick up Metal in High Traffic Areas | K&D Ohio |
| | 1/14/2019 | Annual Maintenance PO | K&D Ohio |
| | 1/7/2019 | Annual Storm Drain Cleaning PO | K&D Ohio |
| | 12/20/2018 | 2018/2019 Snow Removal PO | K&D Ohio |
| | 12/20/2018 | 2019 Mansfield Road Sweeping PO | K&D Ohio |
| | 12/21/2018 | PO for Transportation of K016 Dust to EQ | K&D Ohio |
| | 1/9/2019 | 2019 Outfall Maintenance PO | K&D Ohio |
| | 1/18/2019 | 2019 Universal Waste Removal PO | K&D Ohio |
| ArcelorMittal | 9/9/2011 | Customer Compliance Agreement for Service Order Work | K&D Ohio |
| City of Mansfield | 1/7/2019 | Blanket PO for Waste Disposal – grease | K&D Ohio |
| | 1/7/2019 | Blanket PO for Lease/rental of Misc. Grease Containers | K&D Ohio |

**EXHIBIT C**

**(Insurance Policies – Section 10.2(i))**

**CHUBB Inland Marine Insurance, Policy Number 0669-61031**

**CHUBB Customarq Series, Customarq Classic Insurance Program, Policy Number 3600-08-43-EUC**

## EXHIBIT D

### (Unpaid Taxes – Section 10.2(j))

**NONE**

## EXHIBIT E

## (Union Contracts – Section 10.2(l))


**Contract between K&D Industries of Ohio, Inc., and the United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union dated January 1, 2017**

**EXHIBIT C**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

In re:

K&D INDUSTRIAL SERVICES     Case No. 19-43823
HOLDING CO., INC., et al,[1]     Chapter 11
    Hon. Phillip J. Shefferly

    Debtor.

---

## NOTICE OF SALE OF ASSETS, BID PROCEDURES, SOLICITATION
## OF COUNTEROFFERS, DEADLINE FOR SUBMITTING OBJECTIONS
## AND HEARING DATE

To the Creditors and Parties in Interest:

Notice is hereby given, pursuant to 11 U.S.C. §363, Fed. R. Bankr. P. 2002(a)(2) and 6004, and LBR 6004-1, that K & D Industrial Services Holding Co., Inc., ("HoldCo"), and the Debtors-in-Possession in the above captioned case ("Debtors"), intend to sell by auction all of the Debtors' right, title and interest in their operating assets owned (all as more specifically described below) (collectively the "Purchased Assets") to Cleaning Contractors, Inc. ("CCI"), a Michigan corporation.

---

[1] The Debtors in these jointly administered proceedings are K&D Industrial Services Holding Co., Inc. (Case No. 19-43823), K&D Industrial Services, Inc. (Case No. 19-43824), K&D Industries, Inc. (Case No. 19-43825), K&D Grand Rapids, Inc. (Case No. 19-43826), K&D Industries of Ohio, Inc. (Case No. 19-43827), K&D Industrial Services Midwest, Inc. (Case No. 19-43828), K&D Industries West, Inc. (Case No. 19-43829), and L&P Industries LLC (Case No. 19-43830).

1

The Debtors have received and accepted an offer to purchase via an Asset Purchase Agreement from CCI dated April 2, 2019 (the "CCI Purchase Agreement"), a copy of which is attached to the Debtors' Motion for Entry of an Order Pursuant to 11 U.S.C. §363 and Federal Rules of Bankruptcy Procedure 2002, 9006, 6004 and LBR 6004-1 (A) Establishing Bidding Procedures for the Auction Sale of certain of Debtors' Assets Free and Clear of Liens, Claims and Encumbrances and Transferring Liens to Proceeds; (B) Scheduling an Auction and a Sale Hearing to Consider Approval of Sale; (C) Establishing Procedures for the Assumption and Assignment of Executory Contracts; (D) Approving the Form of Asset Purchase Agreement, Form and Manner of the Auction Notice, the Form of the Notice to Non-Debtor Co-Parties to Executory Contracts, and the Notice of the Sale Hearing.

The Purchased Assets will be sold free and clear of all liens, claims, encumbrances and interests of any kind or nature. Liens, claims, encumbrances and interests to the extent that they are valid, will attach to the net proceeds of the sale to the same extent and the same order of priority as such liens, claims and encumbrances attached to the Purchased Assets under applicable law. The distribution of the sale proceeds shall be made pursuant to a Liquidating Combined Plan and Disclosure Statement to be filed by the Debtor.

2

The Purchased Assets are defined as follows:

(a) all vehicles and equipment listed on Exhibit A of the CCI Purchase Agreement, including all spare parts, hoses, pumps, tools and accessories related thereto (the "Equipment");

(b) all warranties or guaranties, if any, applicable to the Purchased Assets, to the extent such warranties or guaranties are assignable in connection with the Purchased Assets (the "Warranties"); and

(c) the contracts listed on Exhibit B of the CCI Purchase Agreement, (the "Contracts") provided, however, that any Receivables earned from and/or any work in process associated with any of the assigned Contracts prior to the Closing date shall belong to the Debtors. CCI shall have the right to exclude any Contract from Exhibit B of the CCI Purchase Agreement by giving notice to the Debtors and the counterparty to such contract three (3) business days prior to the Closing.

The terms of the proposed sale are more particularly described in the CCI Purchase Agreement and the Bidding Procedures, are as follows:

**(I)    BIDDING PROCEDURES.**

(a)    <u>**Participation Requirements.**</u> Unless otherwise ordered by the Court, each person (a "Potential Bidder") interested in participating in the sale process must deliver by the second (2nd) Business Day before the Bid Deadline to counsel for the Debtors, Lynn M. Brimer, Strobl Sharp PLLC, 300 E. Long Lake Rd., Ste. 200, Bloomfield Hills, MI 48304, such financial statements, financing commitments, or other documents as the Potential Bidder believes provide adequate assurance to the Debtors and their advisors of such Potential Bidder's ability to close on a purchase of the Purchased Assets (the "Transaction"). As used herein, the term "Business Day" shall mean a day on which the Court is open.

(b)    <u>**Definition of Qualified Bidder.**</u> Unless otherwise ordered by the Bankruptcy Court for cause shown, a Potential Bidder, shall become a "Qualified Bidder" if the Potential Bidder delivers to counsel for the Debtors on or prior to the Bid Deadline, as described below, the

3

following:

(i)   Financial disclosures and other information acceptable to the Debtors, to demonstrate such Potential Bidder's financial and other abilities to consummate a sale with respect to any expected bid;

(ii)  A fully executed asset purchase agreement (which must be in the form of the CCI Purchase Agreement) which provides, among other things, that any Qualified Bid (as defined below, and any bid made subsequently thereto) made by such Potential Bidder with respect to the Purchased Assets shall be irrevocable until a sale of the Purchased Assets is fully consummated by the Debtors regardless of whether the sale occurs to the Potential Bidder or another party (but in no event later than thirty (30) days after the Auction Date without the consent of both parties);

(iii) A Qualified Bid (as defined below), in writing and signed by the Potential Bidder and any other persons against whom the Potential Bidder intends that the bid can be enforced, including but not limited to guarantors (an "Initial Qualified Bid"), must be delivered to counsel for the Debtors addressed to the person stated in the Notice at the address stated in the Notice, not later than the date and time of the Bid Deadline, and such other persons as appear on the Notice; and

(iv)  A certified check or wired funds an amount equal to Fifty-Five Thousand and 00/100 Dollars ($55,000.00). The Deposit shall be subject to the jurisdiction of the Bankruptcy Court. (Any of the above possible deposits referred to herein as a "Good Faith Deposit").

(c)   **Due Diligence.** The Debtors are not responsible for, and will bear no liability with respect to, any information obtained by any Qualified Bidder in connection with the sale of the Purchased Assets unless such Qualified Bidder becomes the Successful Bidder and such liability and responsibility is provided for in the agreement evidencing the Transaction between the Debtors and the Successful Bidder and such agreement is approved by the Court.

4

(d)    **Bid Deadline.**  A Qualified Bidder who desires to make a bid shall advise and deliver a bid to counsel for the Debtors, Lynn M. Brimer, Strobl Sharp PLLC, 300 E. Long Lake Rd., Ste. 200, Bloomfield Hills, MI 48304, no later than 5:00 p.m. (prevailing Eastern Time) on April 26, 2019 (the "Bid Deadline").

(e)    **Definition of Qualified Bid.**  Unless otherwise ordered by the Bankruptcy Court for cause shown, a bid shall become a "Qualified Bid" only if the following occurs:

   (i)    The bid must be made by a Qualified Bidder.

   (ii)   The bid must be substantially in the form of the CCI Purchase Agreement attached as **Exhibit B** to the Motion, or as amended from time to time.  The Debtors believe that the terms and conditions of the CCI Purchase Agreement are in the best interest of the estate.  If a bid deviates from the CCI Purchase Agreement in any manner, the Qualified Bidder must also provide, at the time of submission of the bid, a black-lined copy of the CCI Purchase Agreement to indicate the relevant changes.

   (iii)  The minimum aggregate consideration to be received by the Debtor in the bid shall equal or exceed the Purchase Price in the CCI Purchase Agreement plus the break-up fee of Thirty Thousand and 00/100 Dollars ($30,000.00) (the "Break-Up Fee"), plus Twenty-Five Thousand and 00/100 Dollars ($25,000.00).  All subsequent bids must be in increments of at least Thirty-Five Thousand and 00/100 Dollars ($35,000.00).

   (iv)   The bid must include written evidence of a commitment for financing or other evidence of the ability to consummate the Transaction satisfactory to the Debtors with appropriate contact information for such financing sources.

   (v)    The bid shall contain no material additional contingencies or material requirements binding the Debtors, including but not limited to financing contingencies or contingencies relating to the outcome of due diligence.  The Debtor will disregard bids

5

that are conditioned on obtaining financing or on the outcome of unperformed due diligence by the bidder other than such due diligence as is contemplated in the CCI Purchase Agreement.

Provided that it otherwise meets the applicable requirements above, the CCI Purchase Agreement shall constitute a Qualified Bid.

(f) **Auction**.

    (i)    Prior to the Auction, the Debtors, through their counsel, shall evaluate any Qualified Bids submitted in accordance with these procedures and, through counsel, shall select the offer, if any, which they determine in their business judgment, is the higher and/or best offer for the Purchased Assets. The Debtors may take circumstances other then simply the Purchase Price into consideration when evaluating the Qualified Bid of any Qualified Bidder The Qualified Bid of any Qualified Bidder other than Joe Site must meet the cash consideration outlined in Paragraph (c)3. To be considered (the "Initial Accepted Offer").

    (ii)    If there is at least one Qualified Bid other than the Initial Accepted Offer, the Debtors may conduct an auction (the "Auction") with respect to the Purchased Assets. The Auction shall commence at 10:00 a.m. on April 29, 2019 (the "Auction Date") at the offices Debtors' counsel, Lynn M. Brimer, Strobl Sharp PLLC, 300 E. Long Lake Rd., Suite 200, Bloomfield Hills, Michigan 48304. The Debtors shall notify all Qualified Bidders who have submitted Qualified Bids of the time and place of the Auction. Only a Qualified Bidder who has submitted a Qualified Bid is eligible to participate at the Auction. The Debtors reserve the right to adjourn the Auction from time to time by announcement at the Auction.

    (iii)    The Debtors may conduct the Auction without the assistance of a separately retained auctioneer. The Auction may be continued from day to day as determined by the Debtors. The Auction shall be conducted by the Debtors in a manner calculated by them in their sole discretion to achieve the higher and/or best offer for the Purchased Assets, in accordance with the other terms herein.

6

(iv)    Upon conclusion of the bidding, the Auction shall be closed. The Debtors shall immediately review each Qualified Bid(s) on the basis of financial and contractual terms and the factors relevant to the sale process, including those factors affecting the speed and certainty of consummating the sale. In the event the Debtors, through their counsel, determine that one of the Qualified Bids received represents (i) fair consideration, and (ii) the highest or otherwise best offer for the Purchased Assets, the Debtors, through their counsel, shall present that Qualified Bid (the "Successful Bid") to the Bankruptcy Court for approval at the Sale Hearing, substituting (if necessary) the Qualified Bid for the CCI Purchase Agreement, and seeking authority to consummate a sale transaction with the party asserting such Successful Bid (the "Successful Bidder").

(v)    The acceptance of a Qualified Bid by the Debtors, through their counsel, or the acceptance of no Qualified Bids by the Debtors at the Auction, shall not constitute or be deemed a rejection of any other Qualified Bids, except insofar as such Qualified Bids are revocable in accordance with these procedures.

(g)    **<u>Closing.</u>**

(i)    Unless otherwise ordered by the Court, closing on the Purchased Assets shall occur in accordance with the terms of the Successful Bid.

(ii)    In the event closing does not occur in accordance with the material terms of the Successful Bid, then within five (5) business days after the scheduled closing date, the Debtors, through their counsel, shall notify the party that submitted the next highest or otherwise best offer for the Purchased Assets other than the Successful Bid that its Qualified Bid is accepted and that its bid has become the Successful Bid (the "New Successful Bid"). Closing on the New Successful Bid shall occur within fourteen (14) days after it receipt of the Debtors notification by the new Successful Bidder.

7

(iii) In the event CCI is not the Successful Bidder and pursuant to the other terms of the CCI Purchase Agreement, CCI shall be entitled to the Break-Up Fee.

(h) **Escrow of Good Faith Deposits.** The Good Faith Deposits of all Qualified Bidders (except for the Successful Bidder) shall be held in a segregated escrow account until the earlier of the Closing of the sale of the Purchased Assets or May 7, 2019. If a Successful Bidder fails to consummate an approved sale because of a breach or failure to perform on the part of such Successful Bidder, the Debtors shall be entitled to retain the Good Faith Deposit as liquidated damages resulting from the breach or failure to perform by the Successful Bidder. The Debtors shall return all good faith deposits immediately upon closing or May 7, 2019, whichever is earlier.

(i) Notwithstanding anything herein to the contrary the Debtors shall be permitted to effectuate a sale of the Purchased Assets without employing the foregoing procedures, so long as such sale is approved by the Court in accordance with the Bankruptcy Code, the Bankruptcy Rules, and the Local Rules of this Court.

(j) All insider relationships between any Qualified Bidder and the Debtors shall be disclosed in the Qualified Bid and the Sale Agreement and/or Successful Bid presented to the Court. In the event a Potential Bidder is, or is owned, controlled, or employed by, the Debtors or any insider thereof, said bidder (or its owner, controller or employer) shall have no input in the deliberative process in connection with the applicable Group or the qualification of any potential bidders with respect thereto

The deadline for filing an objection to the Debtors' Motion to sell their Purchased Assets has been set as May 1, 2019. A hearing on the Sale has been scheduled for _____, 2019.

Any questions concerning the intended sale shall be addressed to the undersigned.

8

Respectfully submitted,

STROBL SHARP PLLC


_____/s/_____Lynn M. Brimer_____
LYNN M. BRIMER (P43291)
PAMELA S. RITTER (P47886)
JAMES M. McARDLE (P82443)
Strobl Sharp PLLC
Attorneys for Debtor
300 East Long Lake Road, Suite 200
Bloomfield Hills, MI 48304-2376
Telephone: (248) 540-2300
Facsimile: (248) 645-2690
E-Mail: lbrimer@stroblpc.com

Dated: April 2, 2019

9

EXHIBIT D

# UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

**In re:**

| | |
|---|---|
| **K&D INDUSTRIAL SERVICES** | **Case No. 19-43823** |
| **HOLDING CO., INC., et al,[1]** | **Chapter 11** |
| | **Hon. Phillip J. Shefferly** |
| **Debtor.** | |

---

## NOTICE OF OPPORTUNITY TO OBJECT TO ASSUMPTION
## AND ASSIGNMENT OF EXECUTORY CONTRACTS
## <ins>AND UNEXPIRED LEASES</ins>

TO: All Interested Parties

    **PLEASE BE ADVISED** that on April \_\_, 2019, the Court entered its Order Pursuant to 11 U.S.C. §363 and §365, Bankruptcy Rules 2002 and 6004, and Local Rules 6004 and 9014 for Motion for Entry of Order (A) Establishing Bidding Procedures for the Auction Sale of certain all of Debtors' Assets Free and Clear of Liens, Claims and Encumbrances and Transferring Liens to Proceeds; (B) Scheduling an Auction and a Sale Hearing to Consider Approval of Sale; (C) Establishing Procedures for the Assumption and Assignment of Executory Contracts; (D) Approving the Form of Asset Purchase Agreement, Form and Manner of the Auction Notice, the Form of the Notice to Non-Debtor Co-Parties to Executory Contracts, and the Notice of the Sale Hearing entered at Docket #_____ *(the "Bidding Procedures Order").*

    **PLEASE BE FURTHER ADVISED** that the Debtors are seeking authority from the Court to sell the Purchased Assets, free and clear of all liens, interests and

---

[1] The Debtors in these jointly administered proceedings are K&D Industrial Services Holding Co., Inc. (Case No. 19-43823), K&D Industrial Services, Inc. (Case No. 19-43824), K&D Industries, Inc. (Case No. 19-43825), K&D Grand Rapids, Inc. (Case No. 19-43826), K&D Industries of Ohio, Inc. (Case No. 19-43827), K&D Industrial Services Midwest, Inc. (Case No. 19-43828), K&D Industries West, Inc. (Case No. 19-43829), and L&P Industries LLC (Case No. 19-43830).

1

encumbrances (the "Sale"). A hearing on the Sale has been scheduled for
_____, 2019, at _____ (the "Sale Hearing")

**PLEASE BE FURTHER ADVISED** that in conjunction with the Sale, the Debtors may assume some or all of the executory contracts and/or unexpired leases that are outlined on the attached Cure Schedule. The assumed contracts and leases shall be assigned to the Purchaser of the Purchased Assets at the closing of the Sale.

**PLEASE BE FURTHER ADVISED** that pursuant §365 of the Bankruptcy Code, the Debtors propose to pay the cure amounts outlined on the Cure Schedule to the counterparty to each contract or lease that is assumed (the "Pre-Petition Cure Amount").

**PLEASE BE FURTHER ADVISED** that the Debtors shall make cure payments within thirty (30) days of the closing of the Sale.

**PLEASE TAKE NOTICE** that, pursuant to the Bidding Procedures Order, after receiving a Qualified Bid for the Purchased Assets, the Debtors shall promptly notify, by electronic, overnight mail and/or facsimile, each counter-party to a contract or lease that is to be assigned to the maker of such Qualified Bid, and shall supply such counter party with the Adequate Assurance of future performance proposed by the Qualified Bidder for each contract and lease that the Qualified Bidder is to be assigned.

**PLEASE TAKE FURTHER NOTICE THAT THE BANKRUPTCY COURT HAS ORDERED THAT ANY OBJECTION TO THE PROPOSED CURE AMOUNT OR THE ASSUMPTION AND ASSIGNMENT OF THE ASSUMED CONTRACTS AND ASSUMED LEASES OR THE PRE-PETITION CURE AMOUNT MUST BE FILED WITH THE CLERK OF THE BANKRUPTCY COURT NO LATER THAN APRIL 26, 2019 (THE "OBJECTION DEADLINE"). IN THE CASE OF THE PROPOSED ASSUMPTION AND ASSIGNMENT CONTAINED IN A SUPPLEMENTAL LIST OF CONTRACTS, THE OBJECTION DEADLINE SHALL BE FIVE (5) DAYS AFTER SERVICE OF THE SUPPLEMENTAL LIST.**

**PLEASE BE FURTHER ADVISED** that for each Assumed Contract and Assumed Lease for which an objection is timely received, a hearing will be held at the Sale Hearing or such other date as the Court may designate upon twenty-four (24) hours' telephonic, electronic or facsimile notice to the objecting party.

2

**PLEASE BE FURTHER ADVISED THAT OBJECTIONS (IF ANY), MUST: (A) BE IN WRITING; (B) SET FORTH THE WITH DETAIL THE GROUNDS FOR THE OBJECTION, AND THE BASIS FOR THE CALCULATION OF ANY ALTERNATIVE CURE AMOUNT; (C) COMPLY WITH THE BANKRUPTCY RULES AND THE LOCAL BANKRUPTCY RULES AND ORDERS OF THIS COURT; (D) BE FILED WITH THE CLERK OF THE BANKRUPTCY COURT ON OR BEFORE THE OBJECTION DEADLINE; AND (E) BE ACTUALLY SERVED AND RECEIVED BY THE PARTIES ON THE ATTACHED SERVICE LIST BY THE OBJECTION DEADLINE.**

**PLEASE TAKE FURTHER NOTICE THAT UNLESS YOU FILE WITH THE COURT AN OBJECTION TO THE ASSUMPTION AND/OR ASSIGNMENT, OR TO THE PREPETITION CURE AMOUNT AS DESCRIBED ABOVE, OR UNLESS THE BANKRUPTCY COURT DIRECTS OTHERWISE, YOU WILL BE FOREVER BARRED FROM OBJECTING TO THE CURE AMOUNT OR THE ASSUMPTION AND ASSIGNMENT OF ANY EXECUTORY CONTRACT OR LEASE.**

**PLEASE BE FURTHER ADVISED** that counterparties to contracts or eases that are assumed and assigned will be notified of the assumption and assignment promptly after the closing of the Sale.

**PLEASE BE FURTHER ADVISED** that contracts and leases not assumed and assigned will be rejected after separate notice and opportunity for hearing.

**COPIES OF THE ASSIGNMENT MOTION ARE AVAILABLE FROM DEBTORS' COUNSEL, LYNN M. BRIMER, STROBL SHARP, PLLC, 300 E. LONG LAKE RD., STE. 200, BLOOMFIELD HILLS, MI 48304.**

3

Respectfully submitted,

**STROBL SHARP PLLC**

Date: April 2, 2019

*/s/ Lynn M. Brimer*

LYNN M. BRIMER (P43291)
PAMELA S. RITTER (P47886)
JAMES M. McARDLE (P82443)
Strobl Sharp PLLC
300 E. Long Lake Road, Suite 200
Bloomfield Hills, MI 48304-2376
(248) 540-2300; fax (248) 645-2690
Attorneys for Debtor and Debtor in Possession
lbrimer@stroblpc.com
pritter@stroblpc.com
jmcardle@stroblpc.com

{S&B/12121/002/PLDG/SB673348.DOC}

4