# UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

In re:

K & D Industrial Services
Holding Co., Inc., *et al.,*[1]

      Debtors.

_____/

Chapter 11
Jointly Administered
Case No. 19-43823
Hon. Phillip J. Shefferly

## OPINION GRANTING DEBTORS' MOTION FOR APPROVAL OF SALE OF ASSETS FREE AND CLEAR OF CLAIMS AND INTERESTS

## Introduction

This matter involves a proposed sale of assets by two Chapter 11 debtors under

§ 363(b) of the Bankruptcy Code.  There are no objections to the proposed sale.

However, a pension fund objects to the motion's request under § 363(f) of the

Bankruptcy Code that the sale be made free and clear of a possible liability to the

pension fund.  For the reasons set forth in this opinion, the Court will overrule the

pension fund's objection and grant the motion.

---

[1] The following cases are being jointly administered for procedural purposes only and include: K & D Industrial Services Holding Co., Inc. (case no. 19-43823; K & D Industrial Services, Inc. (case no. 19-43824); K&D Industries, Inc. (case no. 19-43825);
K & D Grand Rapids, Inc. (case no. 19-43826); K & D Industries of Ohio, Inc. (case no. 19-43827); K & D Industrial Services Midwest Inc. (case no. 19-43828); K & D Industries West, Inc. (case no. 19-43829); and L & P Industries LLC (case no. 19-43830).

## Jurisdiction

This is a core proceeding under 28 U.S.C. § 157(b)(2)(M), over which the Court has jurisdiction pursuant to 28 U.S.C. § 1334(a) and § 157(a).

## Facts

The following facts are taken from the Court file and are not in dispute.

K & D Industrial Services Holding Co., Inc. ("K&D Holdings"), is a holding company that owns seven separate companies (together with K&D Holdings, the "K&D Companies") engaged in environmental and industrial services. The areas of service include industrial cleaning, environmental cleaning and remediation, and transporting hazardous and non-hazardous waste products and byproducts. The K&D Companies have been in business since the 1970s, primarily in Michigan but also in Ohio, Wisconsin, and Illinois. The K&D Companies' workforce is highly skilled and trained both in environmental services and in safety measures and procedures necessary to provide such services.

In 1974, one of the K&D Companies, K&D Industrial Services, Inc. ("K&D Industrial"), entered into a collective bargaining agreement ("CBA") with the Operating Engineers' Local 324 ("Union"). In 1987, another one of the K&D Companies, K & D Industries West, Inc. ("K&D West"), also entered into a CBA with the Union. These are the only two of the K&D Companies that have CBAs

with the Union.  The CBAs have been renewed over the years and remain in effect today.  The CBAs require those two companies to contribute to Operating Engineers' Local 324 Pension Fund ("Pension Fund"), a multi-employer pension fund.  Both K&D Industrial and K&D West have made all of their required contributions to the Pension Fund.

Over the years, the K&D Companies have been financed by Chemical Bank ("Bank").  The Bank's loans are secured by all of the assets of the K&D Companies. The Bank is owed approximately $5,200,000.00 by the Debtors.

In early 2018, after more than four decades of operations, the K&D Companies determined that their business required either refinancing or an infusion of substantial capital from an outside source.  The K&D Companies retained professionals to assist them in locating funding.  However, the K&D Companies found that a major obstacle to obtaining funding was the potential for a large liability to the Pension Fund for

what is known as withdrawal liability.[2]  As a result, the efforts of the K&D Companies to obtain refinancing or an infusion of capital were unsuccessful.

The K&D Companies believed that if forced to shut down abruptly, any enterprise value would be lost and the creditors — in particular, the Bank — would receive far less proceeds if the assets of the K&D Companies were liquidated on a piecemeal basis.  The K&D Companies recognized that selling all of their assets and ceasing their business operations would constitute a triggering event for withdrawal liability to the Pension Fund.  However, with insufficient funding to continue business operations, after considering all of their options, the K&D Companies concluded that they each had to file Chapter 11 petitions so they could sell their assets and wind down their affairs in an orderly way, with the goal of preserving as much value as

---

[2] The Sixth Circuit Court of Appeals recently explained withdrawal liability as follows in Trustees of Operating Engineers Local 324 Pension Fund v. Bourdow Contracting, Inc., 919 F.3d 368, 373 n.2 (6th Cir. 2019):

> Withdrawal liability is a statutory obligation imposed upon a member of a multi-employer pension plan if that member partially or completely withdraws from the plan.  While prior to 1980, an employer that withdrew from a multi-employer pension plan could typically do so without any penalty, this often resulted in increased funding obligations for those employers who remained in the plan.  Accordingly, in 1980, Congress enacted the Multiemployer Pension Plan Amendments Act, Pub. L. No. 96-364, 94 Stat. 1208, which amended ERISA in part by imposing withdrawal liability on employers that withdraw from an underfunded multi-employer pension plan.  The goal of this liability was to ensure that each member paid its fair share of the plan's obligations.

-4-

possible by selling business units or groups of assets together, and then file a liquidating plan.

On March 15, 2019, all eight of the K&D Companies (hereafter, the "Debtors") filed petitions for relief under Chapter 11. Each of the Debtors filed a schedule E/F that listed the Pension Fund as the holder of an unsecured claim in the amount of $3,369,495.00, with the description of the claim as "withdrawal liability" and with the designation that the claim is "contingent." In the jointly administered bankruptcy cases, the Debtors have marketed their assets for sale and have now filed three separate motions, each for a different portion of the Debtors' assets and each with a different stalking horse bidder.

On April 2, 2019, the Debtors filed the first sale motion ("Sale Motion") (ECF No. 64). The Sale Motion requests approval for five of the Debtors to enter into an asset purchase agreement with Cleaning Contractors, Inc. ("CCI"), an unrelated entity, to serve as a stalking horse bidder to purchase for $500,000.00 certain assets owned by those five Debtors consisting of vehicles, machinery, equipment, contracts, and other personal property used by those Debtors in the operation of their business.

CCI is only interested in buying the assets described in the Sale Motion if it can do so without fear that it may have to pay any withdrawal liability that the Debtors owe, or in the future may owe, to the Pension Fund. The Debtors state — without any

dispute by the Pension Fund — that the $500,000.00 purchase price to be paid by CCI represents a significant premium for the assets to be sold that is far greater than what would be generated by a piecemeal liquidation of the very same assets. But CCI is not going to make the purchase if there is any chance that it is going to get stuck having to pay the Pension Fund the $3,369,495.00 withdrawal liability that the Debtors list on their schedules. Therefore, the Sale Motion requests authority to make the sale to CCI "free and clear of the Pension Fund's possible employer withdrawal liability claim against the Debtors."

The Court approved bid procedures for the Sale Motion and set deadlines for competing bids and objections to the Sale Motion. No competing bids were made, so the Debtors requested approval of the sale to CCI. No objections were made to the sale of the assets to CCI.

On April 15, 2019, the Pension Fund filed an objection (ECF No. 99) — not to the sale itself — but only to the Sale Motion's request that the sale be made "free and clear of the Pension Fund's possible employer withdrawal liability claim against the Debtors." More specifically, the Pension Fund objects to the Sale Motion's request for a finding that CCI is "not the successor of the Debtors" and is "not the alter ego or continuation of any of the Debtors."

On April 29, 2019, the Debtors filed a response (ECF No. 136) to the Pension Fund's objection. The Bank filed a concurrence (ECF No. 146) in the Debtors' response. On May 6, 2019, the Pension Fund filed a reply (ECF No. 147). On May 9, 2019, the Court held a hearing and took the matter under advisement.

## Issues

The Pension Fund's objection and the Debtors' response identify four issues.

First, does the Pension Fund hold a claim in the Debtors' bankruptcy cases?

Second, if the Pension Fund does hold a claim, can the sale to CCI be approved free of such claim?

Third, does the public policy of the Employee Retirement Income Security Act ("ERISA") to protect pension plans by means of withdrawal liability outweigh the public policy of the Bankruptcy Code to permit free and clear sales to maximize the value of assets for the benefit of a debtor's creditors?

Fourth, should the Court deny the Sale Motion because the Debtors are attempting to evade and avoid the contingent withdrawal liability to the Pension Fund that may exist in the future?

The Court will address these issues in sequence.

## **Discussion**

1. <u>Does the Pension fund have a claim in the Debtors' bankruptcy cases?</u>

The Pension Fund readily concedes that § 363(f) free and clear sales are routinely used in bankruptcy cases throughout the country to permit debtors and trustees to maximize the recovery of proceeds for a debtor's creditors. The Pension Fund does not dispute that this is because prospective purchasers of assets from a bankrupt person or entity are willing to bid more for the assets if they have the assurance from a bankruptcy court order that they will not later on be made responsible for the bankrupt's debts. But in this case, the Pension Fund argues that the sale to CCI cannot be made free and clear of withdrawal liability because — notwithstanding what the Debtors listed on their schedules — the Pension Fund does not presently have a claim for withdrawal liability because the Debtors have not yet withdrawn from the Pension Fund. The Pension Fund does not contest the calculation of the amount scheduled by the Debtors, but argues that because the Pension Fund does not presently hold a claim for that withdrawal liability, it follows that there can be no sale to CCI free of such claim.

The Debtors counter that because of the two CBAs that require contributions to the Pension Fund, the Multiemployer Pension Plan Amendments Act of 1980, 29 U.S.C. § 1381, <u>et</u> <u>seq.</u> ("MPPAA"), creates a right to payment in favor of the

Pension Fund for the Debtors' share of unfunded vested benefits in the Pension Fund when the Debtors terminate their businesses and withdraw from the Pension Fund. Although the Debtors' obligation to pay the withdrawal liability has not yet matured because the Debtors have not yet withdrawn from the Pension Fund, this fact is simply a contingency that will be met when the Debtors do withdraw. This contingency is certain to occur during these Chapter 11 cases because the Debtors are selling all of their assets and ceasing all of their business operations prior to filing and seeking confirmation of a liquidating plan. The Debtors point out that the Pension Fund has already done the calculation and knows that the withdrawal liability will be in the $3,369,495.00 amount that the Debtors have listed in their schedules. These facts, the Debtors argue, demonstrate that the Pension Fund does hold a claim right now, and the Debtors request that the sale to CCI be made free and clear of such claim.

The starting point to determine whether the Pension Fund holds a claim in the Debtors' bankruptcy cases is the Bankruptcy Code section on definitions. A claim is defined by § 101(5)(A) of the Bankruptcy Code as follows:

(5) The term "claim" means—

(A) right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured; or

(B) right to an equitable remedy for breach of performance if such breach gives rise to a right to payment, whether or not such right to an

equitable remedy is reduced to judgment, fixed, contingent, matured, unmatured, disputed, undisputed, secured, or unsecured.

The Debtors' argument that the Pension Fund is within § 105(5)(A) is straight-forward. The Pension Fund has a right to payment of withdrawal liability under the MPPAA, subject only to the contingency of the Debtors withdrawing from the Pension Fund. That contingency will occur during the Chapter 11 cases and the Pension Fund's claim for withdrawal liability will then be enforceable. The Pension Fund does not dispute that the MPPAA imposes withdrawal liability when there is a complete withdrawal from a multiemployer pension plan that has unfunded benefits. Nor does it dispute the fact that there will be a complete withdrawal by the Debtors during their Chapter 11 cases once the Debtors sell all of their assets and shut their business down. But the Pension Fund insists that it does not now have a claim for withdrawal liability, because each of these events has not yet occurred.

Ordinarily, the fact that a right to payment is subject to a contingency is irrelevant to the determination under § 101(5)(A) of whether a claim exists because the text of the statute expressly states that a right to payment is still a claim even if it is contingent. The Sixth Circuit Court of Appeals has recognized that claims are allowed and treated in bankruptcy cases despite the fact that they may have all kinds of contingencies. See Alfes v. Educ. Credit Mgmt. Corp. (In re Alfes), 709 F.3d 631, 636-37 (6th Cir. 2013) (finding that a "guarantor holds a claim against the debtor, and

-10-

as such, [is considered] a creditor for the purposes of bankruptcy proceedings" even though its claim is a contingent claim) (internal quotation marks and citations omitted); Capitol Indus., Inc. v. Regal Cinemas, Inc. (In re Regal Cinemas, Inc.), 393 F.3d 647, 649-50 (6th Cir. 2004) (recognizing that a sublessor's claim for indemnification "amount[ed] to a claim for reimbursement" where it agreed to reimburse the landlord in the event the debtor caused a loss, but disallowing the sublessor's claim because it had already been paid to the landlord directly by the debtor); Norpak Corp. v. Eagle-Picher Indus., Inc. (In re Eagle-Picher Indus., Inc.), 131 F.3d 1185, 1187-88 (6th Cir. 1997) (where the debtor had conducted lead processing operations on land it sold to the appellant, recognizing the appellant's claim for potential environmental cleanup costs was contingent) (internal quotation marks and citation omitted).

To distinguish this case from those Sixth Circuit cases regarding contingencies, and to take the Pension Fund out of § 101(5)(A), the Pension Fund depends entirely on a Sixth Circuit case that specifically dealt with multi-employer withdrawal liability, CPT Holdings, Inc. v. Industrial & Allied Employees Union Pension Plan, Local 73, 162 F.3d 405 (6th Cir. 1998). Like two of the Debtors in this case, Hupp, the Chapter 11 debtor in that case, was a party to a CBA that required it to make contributions to a multi-employer pension fund. Unlike the Debtors in this case, Hupp

continued its business operations throughout its entire Chapter 11 case and confirmed a plan of reorganization that provided for Hupp's business to continue to operate post-confirmation. Under the plan, Hupp expressly assumed the CBA that required payments to continue to be made to the pension fund. The financing for the plan was provided by CPT, a non-debtor entity that contributed $2 million in exchange for 80.1% of Hupp's newly issued stock. After the plan was confirmed, Hupp entered into a new CBA that required it to continue making payments to the pension fund. Unfortunately, the business did not make it. A year and a half later, Hupp's bank foreclosed on its security interests and Hupp shut down its business operations. A few months later, the pension fund assessed a withdrawal liability and demanded payment from CPT. The dispute between CPT and the pension fund was submitted to arbitration. The arbitrator ruled in favor of the pension fund and against CPT. The district court then held that CPT was not liable for the arbitrator's award because the withdrawal liability was a contingent claim in Hupp's bankruptcy case that was discharged by confirmation of Hupp's Chapter 11 plan. Id. at 406.

On appeal, the Sixth Circuit extensively reviewed the law of withdrawal liability under ERISA as well as case law applying the definition of a claim under § 101(5)(A) to withdrawal liability in bankruptcy cases. Ultimately, the Sixth Circuit ruled in favor of the pension fund, upholding the arbitrator's award against CPT,

finding that the withdrawal liability was not a claim in Hupp's bankruptcy case that was discharged by the confirmation order, and holding that "[u]pon the facts at issue, a 'claim' cannot exist prior to withdrawal." Id. at 409.

The Pension Fund argues that CPT Holdings controls this case, and prevents the Court from finding that the Pension Fund holds a claim in this case for purposes of the Court's consideration of the Sale Motion. The Debtors counter that CPT Holdings is factually distinguishable in that the debtor in CPT Holdings did not sell its assets and shut down its business operations during its Chapter 11 case. Instead, the debtor in that case continued its business operations through the entire Chapter 11 case and then confirmed a plan of reorganization that expressly assumed the CBA that required the continuation of contributions to the pension fund. It was only long after confirmation of the debtor's plan when the reorganized business failed and the court was asked to consider whether the previously entered confirmation order discharged any withdrawal liability. In contrast, the Debtors here are indisputably selling all of their assets, shutting down all of their business operations, and stopping any further contributions to the Pension Fund, all during these Chapter 11 cases and prior to any confirmation order. There will not be any reorganization of the Debtors' business under any Chapter 11 plan. Unlike CPT Holdings, all of the facts that will constitute a withdrawal by the Debtors from the Pension Fund, and trigger the assessment of

withdrawal liability in favor of the Pension Fund, are certain to occur during the Debtors' Chapter 11 cases, prior to the entry of any confirmation order.

The CPT Holdings court examined the Bankruptcy Code's definition of "claim" and focused on the definition including a "right to payment." Id. at 407. The Sixth Circuit stated that it did not take issue with the agreement of the parties that a right to payment for withdrawal liability exists where an employer withdraws from a pension plan before confirmation of a Chapter 11 plan. Id. ("The parties agree, at least implicitly, that a "claim" for withdrawal liability exists where an employer withdraws prior to confirmation of a chapter 11 reorganization plan, and liability would thus be discharged upon actual confirmation."). CPT Holdings cited several cases in support, where the courts held that an underfunded pension plan has a claim for withdrawal liability where an employer withdrew from the plan during the Chapter 11 case. Id. at 408 (citing in part In re Pulaski Highway Express, Inc., 57 B.R. 502 (Bankr. M.D. Tenn. 1986) (partial withdrawal pre-petition and complete withdrawal post-petition); In re Silver Wheel Freightlines, Inc., 57 B.R. 476 (Bankr. D. Or. 1985) (where the debtor was still operating as of the petition date, finding that liability arose

-14-

pre-petition but was accelerated post-petition by cessation of the debtor's operations)).[3]

However, in CPT Holdings, Hupp did not withdraw from the pension plan *during* its Chapter 11 case. Therefore, the disagreement was "whether a 'claim' exists at confirmation where an employer assumes a plan's funding obligations during Chapter 11 proceedings, but does not withdraw *until well after confirmation* of the reorganization plan." Id. at 407 (emphasis added). The Sixth Circuit distinguished the cases it had cited, explaining that "[m]any of the above decisions dealt with employers who withdrew *during* Chapter 11 proceedings." Id. at 408. In order for there to be an "enforceable right to payment for withdrawal liability" under the MPPAA, the Sixth Circuit held that the employer "must completely withdraw from the plan prior to confirmation. They cannot remain a part of the plan and simultaneously have their withdrawal liability forgiven should they ever decide to withdraw." Id. at 409 (agreeing with In re United Merchants and Manufacturers, Inc., 166 B.R. 234 (Bankr. D. Del. 1994)).

---

[3] More recently, the court in In re Manhattan Jeep Chrysler Dodge, Inc., no. 18-10657, 2019 WL 1054928 (Bankr. S.D.N.Y. Mar. 4, 2019) found that a pension fund held a claim for withdrawal liability, even though contingent when the debtor filed Chapter 11, and distinguished CPT Holdings because the debtor "planned to sell its assets and to liquidate" during the Chapter 11 case.

Unlike Hupp in CPT Holdings, the Debtors are withdrawing from the Pension Fund during their Chapter 11 cases, prior to confirmation of any Chapter 11 plan. Allowing a claim for withdrawal liability in these circumstances is not inconsistent with CPT Holdings where the Debtors are indisputably selling their assets, ceasing all business operations, stopping any further contributions to the Pension Fund, and withdrawing from the Pension Fund, all *during* — not after — their Chapter 11 cases. These are the exact the circumstances in which CPT Holdings indicated a pension fund would have a "claim," as defined by the Bankruptcy Code.

The Pension Fund suggests that "it is unclear whether K & D Industrial and K & D West will completely withdraw after the sale occurs," but provides no factual support for that argument or otherwise gives the Court any reason to disregard the Debtors' unequivocal statements that they "will terminate all of their operations at the conclusion of the sales of their operating assets" and that all of their "obligations to contribute to the Pension Fund will cease prior to the confirmation of a liquidating plan." These facts distinguish this case from CPT Holdings.

There is one further distinction between CPT Holdings and this case. CPT Holdings did not address the forward looking question of whether a contingent withdrawal liability is a claim for purposes of considering whether to grant a § 363(f) motion for a debtor that is closing its business operations, ceasing contributions to a

-16-

pension fund and triggering a withdrawal liability. Instead, <u>CPT Holdings</u> addressed only the after the fact question of whether a contingent withdrawal liability was a claim for purposes of determining whether it was discharged by a previously entered order confirming a Chapter 11 plan of reorganization for a debtor that was continuing its business operations, assuming a CBA, and continuing to make contributions to a pension fund post-confirmation. This case presents a different issue than <u>CPT Holdings</u>.

<u>CPT Holdings</u> is binding precedent in this circuit. But it is important to note that the Sixth Circuit expressly stated in <u>CPT Holdings</u> that its holding was based "[u]pon the facts at issue," in that case. The facts before this Court are materially different, and compel a different conclusion. The Court does not read <u>CPT Holdings</u> as controlling this case or as preventing the Court from holding that currently untriggered withdrawal liability is a claim in this case under § 101(5)(A) where the Debtors are indisputably selling all assets, ceasing all business operations, and triggering the withdrawal liability during the Chapter 11 cases prior to any order confirming a plan. The Court holds, on the facts of this case, that the Pension Fund does hold a claim for withdrawal liability.

2. <u>Can the sale to CCI be made free and clear of the Pension Fund's claim?</u>

Section 363(b) of the Bankruptcy Code permits a Chapter 11 debtor to sell property of the bankruptcy estate outside the ordinary course of business. Section 363(f) of the Bankruptcy Code permits a Chapter 11 debtor to sell such property "free and clear of any interest in such property of an entity other than the estate" if one of the five conditions set forth in § 363(f)(1)-(5) is present. The Debtors argue that § 363(f) sales are routinely used to allow debtors and trustees to sell assets of a bankrupt debtor for the highest price attainable, undiminished by any fear that a bidder may somehow get stuck paying the debts of the bankrupt person or entity just because they purchased property of the bankruptcy estate. In this case, the Debtors contend that § 363(f)(5) is applicable to the Pension Fund's claim because the Pension Fund "could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest." In other words, the Pension Fund's claim could be satisfied by payment in full.

The Pension Fund denies that it holds a claim against the Debtors for withdrawal liability but, even if it does, § 363(f) of the Bankruptcy Code only permits a sale of bankruptcy estate property free of any "interest in such property," not free of its claim. According to the Pension Fund, because its claim for withdrawal liability is not an in rem interest in the assets to be purchased by CCI, the Court may not

-18-

approve a sale that is free and clear of the Pension Fund's claim. The Pension Fund notes that it does not assert that the purchase of such assets by CCI will automatically make CCI responsible for any withdrawal liability, but it wants to preserve its right to make that assertion in the future. Therefore, the Pension Fund objects to the findings requested by the Sale Motion that the sale is "free and clear of the Pension Fund's possible employer withdrawal liability claim against the Debtors," that "CCI is not the successor of the Debtors" and that CCI "is not the alter ego or continuation of the Debtors."

In support, the Pension Fund relies primarily on <u>Michigan Employment Security Commission v. Wolverine Radio Co.</u> (<u>In re Wolverine Radio Co.</u>), 930 F.2d 1132 (6th Circuit 1991). In that case, the debtor owned and operated a radio station. The debtor filed a Chapter 11 petition and confirmed a plan of reorganization that approved a sale of the debtor's assets to JOSI, "free and clear of any . . . claims." The Michigan Employment Security Commission ("MESC") was owed $7,606.91 by the debtor for unpaid taxes, interest and penalties. The confirmed plan provided that this claim would be paid over five years. Sometime after confirmation of the plan, the MESC wrote JOSI to notify it that the MESC had determined to fix JOSI's ongoing contribution rate for payment to the employment security fund at 10% based on the poor contribution history from the time when the debtor owned and operated the radio

station.  The debtor and JOSI objected to the MESC's determination, arguing that

under § 363(f), JOSI had purchased the radio station free and clear of all interests,

including the experience rating that the MESC assigned to the debtor during the time

that it owned and operated the radio station.  The MESC argued that the experience

rating of the debtor was not an interest within the meaning of § 363(f) and, therefore,

the debtor's experience rating survived the sale of the radio station to JOSI.  Id. at

1135-37.

The Sixth Circuit, noting that § 363(f) provides that property may be sold "free

and clear of any interest in such property," held that

> [w]e do not perceive the experience history of Wolverine as an "interest"
> that attaches to property ownership so as to cloud its title.  The
> application of the rate creates a fund which is to be used prospectively
> and, in assessing JOSI's contribution rate, MESC is not attempting to
> collect a pre-petition debt.

Id. at 1147 (footnote omitted).

The Pension Fund cites Wolverine Radio as standing for the proposition that

the free and clear "language of § 363(f) does not extend to unsecured claims," but

Wolverine Radio makes no such statement.  While the MESC did hold an unsecured

claim against the debtor for unpaid contributions of $7,606.91, that claim was not at

issue in the matter before the Sixth Circuit.  The issue before the Sixth Circuit was

whether or not the *experience rating* of the debtor was an interest for purposes of

§ 363(f). That the Sixth Circuit concluded that it was not, does not mean that a claim against a debtor is not an interest for purposes of § 363(f).

Although § 363(f) states that a sale of property can be made "free and clear of any interest in such property," the Sixth Circuit, like other circuit courts, has construed this subsection as permitting a sale free and clear of any claim against the debtor as well as an in rem interest in property. In <u>Al Perry Enterprises, Inc. v. Appalachian Fuels LLC</u>, 503 F.3d 538 (6th Cir. 2007), the Chapter 11 debtor, Bowie, entered into an agreement to sell substantially all of its assets to Appalachian Fuels. The bankruptcy court approved the sale and entered a final order stating that the sale was "free and clear of all liens, claims and encumbrances" with the exception of any specifically identified permitted liens. After the sale was closed, a sales agent, Perry, filed suit in the bankruptcy court against Appalachian Fuels for unpaid commissions owed to it by Bowie. One of the issues before the Sixth Circuit was whether the bankruptcy court's order approving the sale to Appalachian Fuels "free and clear of all liens, claims and encumbrances" prevented Perry from seeking to recover the unpaid commissions from Appalachian Fuels, the purchaser of Bowie's assets. The Sixth Circuit held that the order prevented Perry from enforcing his claim for unpaid commissions against Appalachian Fuels.

This circuit has not previously considered the effect of a bankruptcy court's approval of the sale of a bankrupt party's assets "free and clear

of all liens, claims and encumbrances." We now hold that the effect of the bankruptcy court's order was to extinguish Perry's claim unless it was expressly assumed by Appalachian Fuels as part of the purchase agreement.

Id. at 541.

In reaching its holding, the Sixth Circuit in Al Perry Enterprises found persuasive the opinion in Car-Tec, Inc. v. Venture Industries, Inc. (In re AutoStyle Plastics, Inc.), 227 B.R. 797 (Bankr. W.D. Mich. 1998), and adopted its reasoning in holding that a bankruptcy court has the power to approve a sale under § 363(f) free of any claims or interests that could be brought against the debtor.

> While not controlling, we find the bankruptcy court's holding in *Car-Tec* to be persuasive and we adopt its holding. The bankruptcy court has clear power to approve the sale of debtors' assets free and clear of any interest or claims that could be brought against the bankrupt estate during bankruptcy pursuant to 11 U.S.C. § 363(f). Perry's claim for commissions for work it had completed prior to the bankruptcy constitutes a pre-petition obligation which satisfies the definition of "claim" in 11 U.S.C. § 101(5)(A) as "a right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured or unsecured."

Id. at 543. See also Marks Mgmt. Servs., Inc. v. Reliant Mfg., Inc., 74 Fed. Appx. 493 (6th Cir. Aug. 18, 2003) (affirming the district court's analysis based on Car-Tec, and finding a § 363 sale was free and clear of a sales agent's claim for commissions).

The Sixth Circuit's holding in Al Perry Enterprises is consistent with the construction of § 363(f) by other circuit courts of appeal. In In the Matter of Motors

Liquidation Co., 829 F.3d 135 (2nd Cir. 2016), the Second Circuit Court of Appeals reviewed a bankruptcy court order that approved the sale of General Motors and stated that the sale was "free and clear of all liens, claims, encumbrances, and other interests of any kind or nature whatsoever, including rights or claims based on any successor or transferee liability."  Following the closing of the sale, a number of claimants sought to collect the debts owed to them by General Motors from the new company that purchased the assets of General Motors.  One of the issues identified by the court was what constitutes an interest for purposes of § 363(f).

> The Code allows the trustee or debtor-in-possession to "use, sell, or lease, other than in the ordinary course of business, property of the estate. 11 U.S.C. § 363(b)(1).  A sale pursuant to § 363(b) may be made "free and clear of any interest in such property" if any condition on a list of conditions is met.  *Id.* § 363(f).  Yet the Code does not define the concept of 'interest,' of which the property may be sold free and clear, nor does it express the extent to which "claims" fall within the ambit of "interests."

Id. at 154 (internal quotation marks and citation omitted).

Recognizing that courts have not formulated a single, precise definition for "any interest in such property," and that courts have continued to address the phrase "on a case by case basis," the Second Circuit held in Motors Liquidation that, at a minimum, § 363(f) permits the sale of property free and clear of an in rem interest in the property to be sold, but also observed that "courts have permitted a broader definition that encompasses other obligations that may flow from ownership of the property."  Id. at

-23-

155 (citation omitted).  The <u>Motors Liquidation</u> court went on to explain that "[s]ister courts have held that § 363(f) may be used to bar a variety of successor liability claims that relate to ownership of property[.]"  <u>Id.</u> (citations omitted).  The common thread identified by the <u>Motors Liquidation</u> court in those cases was "'a relationship between the[ ] right to demand . . . payments from the debtors and the use to which the debtors have put their assets."  <u>Id.</u> (quoting <u>TransWorld Airlines, Inc.</u>, 322 F.3d 283, 289 (3d Cir. 2003)).  The <u>Motors Liquidation</u> court agreed with those cases "that successor liability claims can be 'interests' when they flow from a debtor's ownership of transferred assets."  <u>Id.</u>  (citations omitted).

> To summarize, a bankruptcy court may approve a § 363 sale "free and clear" of successor liability claims if those claims flow from the debtor's ownership of the sold assets.  Such a claim must arise from a (1) right to payment (2) that arose before the filing of the petition or resulted from pre-petition conduct fairly giving rise to the claim.  Further, there must be some contact or relationship between the debtor and the claimant such that the claimant is identifiable.

<u>Id.</u> at 156.

In this case, the Pension Fund's claim for withdrawal liability arose from the pre-petition agreement of two of the Debtors, K & D Industrial and K & D West, to enter into CBAs that required contributions by those Debtors to the Pension Fund. While the withdrawal from the Pension Fund is the contingency that triggers the maturity of the withdrawal liability, it is the pre-petition conduct of K & D Industrial

and K & D West that gives rise to the Pension Fund's claim. That claim is directly related to the ownership and operation by K & D Industrial and K & D West of those assets that these two Debtors now propose to sell to CCI. The Pension Fund's claim for withdrawal liability is not detached from the assets that the Debtors now seek to sell, but is directly related to the ownership and use of those assets by the Debtors to conduct their business. The Pension Fund's claim for withdrawal liability, while not an in rem interest in the assets to be purchased by CCI, is an interest in such assets for purposes of § 363(f).

The Pension Fund acknowledges that Motors Liquidation and other courts have held that the phrase "interests in property" is not limited to in rem interests and can include successor liability claims, but argues that those cases were wrongly decided. In support, the Pension Fund makes three points: first, that the Sixth Circuit has "itself limited the definition of 'interests in property' to *in rem* interests"; second, in contrast to § 363(f), § 1141(c), which addresses the effect of confirmation, contains the phrase "free and clear of all claims and interests"; and third, that under federal common law, liability for a predecessor's debts as a successor or alter ego is dependent on the purchaser's subsequent conduct. None of these three points are persuasive.

First, as explained, the Pension Fund's citation to Wolverine Radio for the proposition that the Sixth Circuit has limited the definition of "interests in property"

to in rem interests is not accurate. <u>Wolverine Radio</u> held only that the debtor's contribution history for purposes of the MESC assessing the purchaser's contribution rate going forward was not an interest in property under § 363(f). As also noted earlier, the Sixth Circuit has approved sales of property under § 363(f) free of claims that are not themselves in rem interests. See <u>Al Perry Enters.</u>, 503 F.3d at 543; <u>Marks Mgmt. v. Reliant Mfg.</u>, 74 Fed. Appx. 493.

Second, the Pension Fund is correct that § 1141(c) specifically mentions claims as well as interests. But the use of the word claims in the context of plan confirmation, while admittedly different and more explicit than § 363(f) in the context of a sale, does not change the fact that in <u>Al Perry Enterprises</u> and <u>Marks Management</u>, the Sixth Circuit has previously read § 363(f) to authorize a bankruptcy court to approve a sale under § 363(f) free and clear of claims against a debtor. Moreover, other circuit courts of appeal have similarly read § 363(f) to include claims against a debtor. See <u>In re TransWorld Airlines, Inc.</u>, 322 F.3d 283 (3d Cir. 2003) (travel vouchers); <u>In re Leckie Smokeless Coal Co.</u>, 99 F.3d 573 (4th Cir. 1996) (Coal Act obligations).[4]

---

[4] At the hearing, counsel for the Pension Fund, a seasoned bankruptcy counsel, conceded that, in his experience, it is an "accepted practice" for bankruptcy courts to enter orders approving § 363(f) sales with a finding that the sale is free and clear of claims and interests.

-26-

The third point made by the Pension Fund is that the question of whether CCI may be held responsible for the Debtors' withdrawal liability as a successor or alter ego is one that must remain unanswered until CCI's post sale conduct is known. Stated another way, the Pension Fund argues that the Court cannot make any findings today as to whether CCI's future conduct may make it liable as a successor or alter ego to the Debtors. This misses the point of § 363(f). The point of the statute is not to determine who would win or lose a successor or alter ego fight some time in the future. The point of the statute is to permit a purchaser like CCI to purchase assets from a bankruptcy estate free of the risk that it will be forced into such a fight in the future. The risk that CCI may be held responsible in the future for the Debtors' withdrawal liability because of a successor or alter ego determination that would not be made but for CCI's purchase of assets from the Debtors, is an interest in such assets for purposes of § 363(f). Because this interest is a right to payment of money, it is an interest for which the Pension Fund could be compelled to accept a money satisfaction (i.e., payment in full) and is therefore within § 363(f)(5).

### 3. Does the public policy of ERISA to protect pension plans by means of withdrawal liability outweigh the public policy of the Bankruptcy Code to permit free and clear sales to maximize the sale of assets for the benefit of a debtor's creditors?

The Pension Fund points out that the MPPAA was enacted because of a concern that ERISA did not adequately protect multi-employer pension plans from the adverse

-27-

consequences that result when individual employers terminate their participation and withdraw. The Pension Fund explains that the MPPAA imposes mandatory liability on withdrawing employers for their proportionate share of unfunded pension benefits. Moreover, the MPPAA extends such liability to each trade or business that is under common control with the withdrawing employer so as to prevent an employer from shirking its obligations by fractionalizing its operations into many separate entities. In sum, the MPPAA evinces a strong public policy in favor of protecting multi-employer pension plans and the individuals who rely upon them.

The Debtors do not contest or minimize in any way the Pension Fund's description of the public policy behind the MPPAA. Instead, the Debtors emphasize the strong public policy behind § 363(f) of the Bankruptcy Code to maximize the value of a debtor's assets for distribution to creditors of the debtor in accordance with the priority scheme set forth in the Bankruptcy Code. If a sale of assets out of a bankruptcy estate cannot be made free and clear of a successor or alter ego liability claim, the value of such assets, and the price that a purchaser will pay for such assets, will be deeply depressed, thwarting the policies of the Bankruptcy Code.

Both the Pension Fund and the Debtors are correct. Congress has expressed in ERISA a strong policy of protecting multi-employer pension plans and a strong policy in the Bankruptcy Code of maximizing the return for creditors of a bankruptcy estate.

-28-

Neither of those policies can be ignored. But the Court need not choose between these two important policies to resolve the Pension Fund's objection to the Sale Motion. As explained earlier, § 363(f) provides express statutory authority for the Debtors to sell the assets described in the Sale Motion to CCI free and clear of any interests in such assets. The statute does not direct a bankruptcy court to weigh competing congressional policies in determining whether or not to approve a sale free and clear. Nor is the statute limited to application only when a bankruptcy court finds that no other non-bankruptcy congressional policy is affected. The Court is not persuaded that the legitimate public policy of the MPPAA requires the Court to deny the Sale Motion under § 363(f).[5]

4. Should the Court deny the Sale Motion
because the Debtors are attempting to evade and avoid
a contingent withdrawal liability to the Pension Fund?

The Pension Fund notes that under § 4212(c) of ERISA, 29 U.S.C. § 1392(c), "[i]f a principal purpose of any transaction is to evade or avoid liability under this part, this part shall be applied (and liability shall be determined and collected) without

---

[5] The Pension Fund cites various non-bankruptcy cases that have found successor or alter ego liability as to withdrawal liability claims, highlighting Trustees of Operating Engineers Local 324 Pension Fund v. Bourdow Contracting, Inc., 919 F.3d 368 (6th Cir. 2019). In Bourdow, the Sixth Circuit imposed withdrawal liability on a non-debtor entity as an alter ego of another entity that had previously filed a bankruptcy case. But the Pension Fund does not cite a single case in which a § 363(f) sale requesting approval of a sale free and clear of withdrawal liability was denied because of the public policy of the MPPAA.

-29-

regard to such transaction." The Pension Fund then alleges that the Debtors may have filed these Chapter 11 cases to evade or avoid withdrawal liability. The Pension Fund cites <u>Bricklayers & Trowel Trades International Pension Fund v. Wasco, Inc.</u>, 551 B.R. 319 (M.D. Tenn. 2015) for the proposition that the Sale Motion should not be granted because evading or avoiding withdrawal liability is a principal purpose of the Debtors in these cases.

In <u>Wasco</u>, a pension fund obtained a pre-petition judgment for withdrawal liability against Wasco. Wasco filed a Chapter 11 petition. Just after doing so, Wasco issued a press release announcing that its disagreement with the union was the reason for filing bankruptcy. Wasco filed a plan of reorganization. The pension fund and the union objected to the plan and moved to dismiss the bankruptcy case because of bad faith by Wasco. On appeal, the district court found that the press release was evidence that Wasco filed its bankruptcy case for the purpose of frustrating the ability of the pension fund to collect the withdrawal liability. The district court further found that pre-petition, Wasco had engaged in "inappropriate and troubling" financial transactions to divert "vast sums of money" into bonuses and excessive compensation for insiders all while favoring other creditors over the judgment held by the pension fund and the union. <u>Id.</u> at 333-34. Based on these facts, the district court held that Wasco's plan could not be confirmed because it was not filed in good faith as required

by § 1129(a)(3) of the Bankruptcy Code and also that Wasco's case must be dismissed for bad faith under § 1112(b) of the Bankruptcy Code.  Id. at 334.

Unlike Wasco, there is no allegation, let alone any evidence, of any wrongdoing by the Debtors or their principals in this case.  The only fact cited by the Pension Fund in support of its contention that the Debtors may be evading or avoiding withdrawal liability is the fact that the Debtors listed on their schedules a contingent claim in favor of the Pension Fund in the amount of $3,369,495.00.  In Wasco, the court considered whether the debtor was trying to avoid paying withdrawal liability in the context of determining whether the debtor's Chapter 11 petition and request for confirmation of a plan were made in bad faith.  In contrast, the matter before this Court is the Sale Motion, which does not ask that the Debtors somehow be excused or absolved from paying withdrawal liability, but asks only that the assets that the Debtors propose to sell to CCI be sold free and clear of the Pension Fund's claim. There is nothing alleged in the record before the Court from which the Court could find that a principal purpose of the Sale Motion is to evade or avoid withdrawal liability to the Pension Fund.

### Conclusion

The Debtors are not reorganizing their business in these Chapter 11 cases.  They are liquidating.  All of their assets will be sold and all of their business operations will

cease during the Chapter 11 cases. To maximize the proceeds from the sale of their assets to distribute to the Bank and to their other creditors, the Debtors are trying to sell groups of assets together. The Debtors' business judgment is that this method of sale will generate more proceeds than if the Debtors' assets are liquidated piecemeal in an auction style fashion. No party challenges the Debtors' business judgment in this regard.

Section 363(f) of the Bankruptcy Code expressly authorizes a sale of this kind and identifies under what circumstances the sale can be made free and clear of interests. Making a sale free and clear of interests has the obvious benefit of attracting prospective purchasers who can bid for assets out of a bankruptcy estate without fear that they are buying themselves a lawsuit — possibly for an amount that greatly exceeds the value of such assets — from the debtor's creditors whose claims may not be fully paid out of the bankruptcy estate.

In this case, the Debtors request in the Sale Motion authority to sell some of their assets to CCI, an entirely unrelated entity. The Pension Fund, although arguing that it has neither a claim against the Debtor nor an interest in the assets to be purchased by CCI, incongruously objects to the free and clear language requested by the Sale Motion. Notwithstanding how the Pension Fund may conceive of its bundle of rights if it has neither a claim nor an interest, the Court finds on the facts of this

case that the Pension Fund does hold a claim and that such claim is an interest for purposes of § 363(f) of the Bankruptcy Code. The Pension Fund protests that a § 363(f) sale to CCI that is free and clear of the Pension Fund's claim grants CCI more rights than it would have if it purchased the assets from the Debtors outside of a bankruptcy case. Perhaps. But this *is* a bankruptcy case, and § 363(f) expressly authorizes the sale of the assets free and clear of the Pension Fund's claim.

For the reasons explained in this opinion, the Court will overrule the Pension Fund's objection and grant the Sale Motion, with the findings requested by it. Counsel for the Debtors is directed to promptly submit for entry an order granting the Sale Motion, approved as to form by all affected parties.

**Signed on May 16, 2019**



/s/ Phillip J. Shefferly

**Phillip J. Shefferly**
**United States Bankruptcy Judge**